**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION**

| | | |
|---|---|---|
| Beverley Somai | : | |
| | : | Case No. |
| Plaintiff, | : | |
| | : | |
| v. | : | Judge |
| | : | |
| City of Bedford, Ohio, | : | |
| | : | JURY TRIAL DEMANDED |
| Defendant. | : | |

## COMPLAINT

1.      This litigation challenges the City of Bedford, Ohio's ("Bedford's" or the "City's") enactment and aggressive enforcement of its discriminatory local nuisance ordinance (the "Nuisance Ordinance" or "Ordinance") Bedford Ord. 511.12—a law that penalizes the City's residents when they or someone near their home calls the police for help. Bedford's Ordinance does not serve any legitimate government purpose, but rather, is primarily used to punish residents when they call the police including to report a crime. The Ordinance was enacted to discriminate against, is disproportionately enforced against, and disproportionately impacts people in protected classes including women, people of color, and people with disabilities. The Ordinance puts the people it targets at risk of being evicted from their homes without due process in the form of notice or an opportunity to respond.

2.      Bedford's Ordinance is one of the harshest such local laws in the country. Under the Ordinance, Bedford can designate someone a nuisance if two perceived violations of any law (except traffic violations) occur "on properties in the City of Bedford or involving an offender residing at a property within the City." Bedford Ord. 511. When calls to police occur on or near a

rental property or merely "involve[]" a renter anywhere in Bedford, Bedford pressures the landlord to evict the tenant by threatening the landlord with fines or criminal prosecution if he does not abate the "nuisance."

3. In this context, the Nuisance Ordinance does not distinguish between offenders and victims: under the Ordinance, Bedford can declare a property a nuisance even if the resident living there is a victim of a crime or is seeking police assistance to investigate a possible crime.

4. In fact, Bedford's most common application of the Ordinance is to threaten or penalize property owners when their tenants seek such assistance.

5. Bedford designed and adopted the Ordinance in 2005 with explicit animus towards members of protected groups, especially Bedford's Black residents. For example, during a city council meeting discussing the Ordinance's enactment, a white Bedford resident spoke up that he was anxious about the changing racial "mixture of the community." In response, Bedford's white Mayor explained that a major purpose of the Ordinance was to target Black residents who were moving to Bedford from Cleveland, and who the Mayor feared brought in a "mentality from the inner city."

6. Bedford aggressively enforces the Ordinance to target residents, particularly renters, who are people of color, women, Housing Choice Voucher Program participants (who are also overwhelmingly people of color and women), single parent or guardian households, and people with disabilities. Bedford applies the Ordinance to these households even though, most often, residents are simply exercising their right to seek police assistance.

7. Bedford amended the Nuisance Ordinance in 2017 to specifically deny procedural due process protections to renters who it designates as nuisances. Bedford now excludes tenants

from receiving notice that Bedford has designated their property as a nuisance, and deprives them opportunity to respond to or contest this designation.

8.      Instead, when Bedford deems someone a nuisance, it sends a letter directly to the property owner, telling them to abate the nuisance—i.e., evict the tenant—or face escalating fines or criminal prosecution.

9.      Plaintiff Beverley Somai ("Ms. Somai"), a resident of Bedford, tried many times to contact the police for help with a neighbor who intimidated her and persistently disrupted her family by making loud noise at their building. Rather than helping her, Bedford used the Ordinance to designate Ms. Somai a nuisance as a direct result of her requests for police assistance. Because of this nuisance designation, Ms. Somai is currently facing eviction proceedings and risks imminent housing instability.

10.     Pursuant to the Nuisance Ordinance, Bedford threatened to fine Ms. Somai's landlord after she asked the police to help her multiple times. That threat was the sole basis on which Ms. Somai's landlord filed eviction proceedings against her.

11.     Consistent with its now-longstanding practice, Bedford is using the Ordinance to penalize, deter, and harass Ms. Somai for exercising her right to speak about her concerns, ask for police assistance, and petition the government for redress of grievances.

12.     Moreover, Bedford is using the Nuisance Ordinance to discriminate against Ms. Somai and her household in violation of the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution and the fair housing laws of Ohio and the United States.

13.     Further, Bedford is using the Nuisance Ordinance to deprive Ms. Somai of due process by denying her notice that calling the police constituted a nuisance and would place her at

risk of eviction, and by denying her any opportunity to contest the application of an Ordinance that impacts her interests.

14.     As a result of the Nuisance Ordinance and its unconstitutional and discriminatory enforcement, residents of Bedford, including Ms. Somai, face eviction and continued violations of their rights.

15.     The Ordinance does not further any public safety goals or any other legitimate governmental interests. To the contrary, by creating and enforcing a penalty for victims of crime and other people who seek police assistance, the Ordinance deters calls for help and crime reporting, *harming* public safety.

16.     Ms. Somai asks this court to strike down the Nuisance Ordinance and permanently enjoin the City from enforcing it, under the United States Constitution and the state and federal fair housing laws.

## I.     <u>JURISDICTION AND VENUE</u>

17.     Jurisdiction of this Court is appropriate pursuant to Article III of the Constitution of the United States, 28 U.S.C. § 1331 & 1343, 42 U.S.C. § 3613, and 28 U.S.C. § 1367.

18.     Venue of this Court is proper under 28 U.S.C. § 1391(b) as this is the judicial district in which a substantial part of the events giving rise to the claims occurred and is where the property that is the subject of the action is situated.

## II.     <u>PARTIES</u>

19.     **Plaintiff Beverley Somai.** Ms Somai is a Woman of Color and resident of Bedford, Ohio where she lives with her son, who has a disability. They rent their apartment at 109 Solon Rd., Apt. 5, Bedford, OH 44146. Ms. Somai and her family are subject to housing instability including potential eviction, among other harms, based on the Nuisance Ordinance.

20.     **Defendant City of Bedford.** The City is a chartered municipal corporation and body politic operating under the Laws of the State of Ohio and is situated wholly within Cuyahoga County, Ohio. Bedford enacted the Nuisance Ordinance and is responsible for its continued enforcement.

### III.    FACTS

### Bedford Adopted its Nuisance Ordinance Out of Fear of Black Residents Moving In

21.     Before the late 1990s, the residents of Bedford were predominantly white, middle-class homeowners. Bedford is an inner-ring suburb that shares its western border with the east side of Cleveland. The residents of Cleveland's east side were predominantly Black during this period and Cleveland's east side continues to have a majority Black population.

22.     Bedford's racial demographics have changed dramatically over the last couple of decades, as Black residents have moved over the urban border.

23.     In 1990, Bedford had a population of 14,822, including 14,015 residents who identified as only white and 671 residents who identified as only Black.[1]

24.     In 2000, the population of 14,214 included 11,231 residents who identified as only white and 2,506 residents who identified as only Black.[2]

25.     And, by 2010 Bedford saw a decreased total population of 13,074, of which 7,051 residents identified as only white and 5,479 residents identified as only Black.[3] Now, Black residents make up the majority of Bedford's population.

---

[1] Census 1990, Social and Economic Characteristics Ohio, Table 7 Race and Hispanic Origin at p. 35, available at https://www.census.gov/prod/cen1990/cp2/cp-2-37-1.pdf (last visited Feb. 16, 2019).

[2] Census 2000, Ohio: 2000 Summary Population and Housing Characteristics, Table 3 Race and Hispanic or Latino at p. 104, available at https://www.census.gov/prod/cen2000/phc-1-37.pdf (last visited Feb. 15, 2019).

[3] Census 2010, available at https://factfinder.census.gov/faces/tableservices/jsf/pages/productview.xhtml?src=bkmk.

26.     Of Bedford's Black residents, 73% were renters when Bedford enacted its law. Of Bedford's white residents, only 30% were renters.[4]

27.     Even though Black residents currently make up a majority of Bedford's residents, Bedford's city government and police department remain predominantly white.

28.     In 2005, when Bedford enacted the Nuisance Ordinance, the Mayor was white and the City Council was comprised of all white members; the Mayor and City Council remain 100% white.[5]

29.     The Bedford Police Department is about 97% white.[6]

30.     Against this backdrop of an increasing Black population and as a direct response to it, Bedford first enacted the Nuisance Ordinance as Ord. 7702.05 in May 2005.

31.     Bedford City Council's meeting minutes leading up to and including the Nuisance Ordinance's enactment demonstrate it was passed with explicit animus towards and purpose to exclude Black residents of Bedford.

32.     At a City Council meeting on April 18, 2005, after noting Bedford's changing racial dynamics, a community member asked what the City was going to do "as far as addressing the mixture of the community," stating that he did not want Bedford to become like two nearby cities (Maple Heights and Warrensville Heights) that are majority Black.[7]

---

[4] U.S. Census Bureau, American Fact Finder, Bedford, Ohio, TENURE (WHITE ALONE HOUSEHOLDER) Universe: Occupied housing units with a householder who is White alone 2005-2009; Bedford, Ohio, TENURE (BLACK ALONE HOUSEHOLDER) Universe: Occupied housing units with a householder who is Black alone 2005-2009.
[5] Bedford City Council Website, available at https://bedfordoh.gov/departments/city-council/ (last visited Feb. 15, 2019).
[6] Nick Castele, "Diversity a Challenge for Suburban Police Departments in Cuyahoga County," WCPN Ideastream, Aug. 29, 2014, available at https://www.ideastream.org/news/diversity-a-challenge-for-suburban-police-departments-in-cuyahoga-county (last visited Feb. 15, 2019).
[7] Bedford City Council Minutes, April 18, 2005.

33.     The Mayor and City Council responded to these concerns at the May 2, 2005 City Council meeting before voting to pass the Nuisance Ordinance:

> Mayor Pocek said one of the things we take pride in is middle class values. We believe in those middle-class values of neighborhoods where people can go home and their home is their castle and feel safe. If you want to go out onto Wandle Avenue at 9:30 p.m. and walk around the block, you should not have any fear. We take pride in that. ***We believe in neighborhoods not hoods. We will do everything we can to maintain those quality of life issues.*** … The Mayor sincerely believes that the person that comes of the inner city is coming for those reasons. The people who do not and bring those values out here, the values of the gang or of drugs, that will not happen here. ***That is one of the reasons we passed that nuisance law tonight***. … Mayor Pocek said he has made mention of the students walking down the streets and ***these are predominantly African American kids who bring in that mentality from the inner city*** where that was a gang related thing by staking their turf. ***We are trying to stop that***.[8]

34.     The Nuisance Ordinance was adopted at the May 2, 2005 meeting by the unanimous vote of the all-white City Council.[9]

35.     On or about January 2, 2006, as the Nuisance Ordinance was beginning to be enforced, the Plain Dealer cited Bedford's Mayor calling "urban immigration" from Cleveland to the suburbs a "culture clash." The Mayor explained that he supported curtailing this "urban immigration" as part of his "quest to preserve what he and officials in other cities refer to as the suburbs' quality of life. It results from class friction in neighborhoods where the population is increasingly poor and, in many cases, [B]lack."[10]

36.     This news report cites Bedford's Nuisance Ordinance as a device Bedford's government used to combat the so-called "urban immigrant." The article quotes a Black Bedford resident lamenting that during the same time period, Bedford took down all of its outdoor

---

[8] Bedford City Council Minutes, May 2, 2005 (emphasis added).
[9] *Id.*
[10] Thomas Ott, "Urban Immigrants Bring a Culture Clash to Older Suburbs," The Plain Dealer, 2006 WLNR 61813 (Jan. 2, 2006).

basketball hoops because, according to Bedford, "families were intimidated by crowds of young [Bl]ack males who blasted music and cursed."[11]

37.     Later, a year after enacting the Nuisance Ordinance, Bedford's Mayor bragged to the Mayor of nearby Campbell, Ohio that the Ordinance "really solved a lot of their problems with section 8," referring to the federal Housing Choice Voucher Program ("HCVP") (of which Plaintiff Ms. Somai is a participant).[12]

38.     Opposition to HCVP participants due to a perceived flaw in their quality or character is commonly coded language for opposition to racial minorities.[13] The phrase "section 8" is often considered to be a racial slur.[14]

39.     Black renters using the HCVP administered by Cuyahoga County Metropolitan Housing Authority ("CMHA") make up 89.6% of the program's participants overall and 95.8% of the HCVP renters in Bedford.[15]

40.     Women renters, particularly single women with children like Ms. Somai, also make up about a third of CMHA's Voucher Program and over half of the voucher households in Bedford.[16]

---

[11] *Id.*

[12] Campbell, Ohio City Council Minutes, Oct. 4, 2005.

[13] *Jones v. Travelers Casualty Insurance Company of America*, No. C-13-02390, 2015 WL 5091908, at *2 (N.D. Cal., May 7, 2015)

[14] *United States v. City of Parma, Ohio*, 494 F. Supp. 1049, 1071 (N.D. Ohio, 1980) (opposition to "section 8" was evidence of racial animus); Emily Badger, "How Section 8 Became a 'Racial Slur,'" Washington Post, June 15, 2015, available at https://www.washingtonpost.com/news/wonk/wp/2015/06/15/how-section-8-became-a-racial-slur/?noredirect=on&utm_term=.e0ca371e2629 (last visited Feb. 15, 2019).

[15] CMHA HCVP Demographic Report by Municipality, Jan. 2, 2016, available at https://www.cmha.net/webshare/docs/aboutus/DemogRptHCVP.pdf (last visited Feb. 15, 2019).

[16] *Id.*

**Bedford Progressively Amended its Ordinance to Make it Harsher**

41.     In 2014, Bedford City Council approved two separate amendments to broaden and intensify the Nuisance Ordinance.[17]

42.     The amendments resulted in four major changes: they (1) increased the scope of the Ordinance to include *any* offense under state or local law except traffic tickets (the original Ordinance used a list of many specific offenses, while the amended version encapsulates almost all offenses); (2) expanded liability to allow a nuisance designation even if the resident committed an offense somewhere other than the property; (3) increased the civil fees associated with violation; and (4) increased the criminal penalty to a first degree misdemeanor.[18]

43.     In 2016 and 2017, academic researchers, advocates, and news media widely discussed the legal defects with criminal activity nuisance ordinances in general, specifically analyzing Bedford's Ordinance. These advocates put Bedford on notice of these issues. In addition, in May 2017, Northeast Ohio's Fair Housing Center for Rights and Research sent a letter to Bedford's City Manager advising him that the Nuisance Ordinance raised Fair Housing Act concerns.

44.     Instead of responding to the legal defects in the Ordinance, Bedford doubled down: it amended the Ordinance again in 2017 for one narrow purpose, to deny renters subject to the Ordinance any notice that the Ordinance has triggered against them. Now, the Ordinance specifies that only property owners—and not the tenants accused of being a nuisance and impacted by the nuisance "abatement"—receive notices of intent to enforce the Ordinance and have the opportunity to appeal any nuisance designation.[19]

---

[17] Bedford Ordinances 9187-14 and 9159-14.
[18] *Id.*
[19] Bedford City Council Work Session Minutes Sept. 5, 2017; Bedford Ordinance 9523-17.

45.     In debating the 2017 amendment, a Bedford City Council member expressed a desire to "have the verbiage cleaned up so the warning letters, billings and/or any assessments would be mailed directly to the property owner; not the tenant. Council had no issues with the request."[20]

### The Current Version of Bedford's Ordinance is Facially Unlawful

46.     Bedford's Nuisance Ordinance is now among the broadest and harshest such local laws in the country.

47.     Unlike most criminal activity nuisance ordinances that clearly identify specific criminal offenses that are considered nuisances, Bedford considers "any violation of a City of Bedford ordinance or the Ohio Revised Code excluding traffic violations" to be a nuisance. 511.12(a)(1). The Ordinance does not, on its face, limit its scope to criminal violations.

48.     Violation of the Ordinance also does not require a criminal conviction. The Ordinance allows the mere allegation of a violation of any law to be used to deem a property a nuisance.

49.     The nuisance designation is triggered either when any perceived violation occurs on a property *or* "involves an offender residing at a property." 511.12(a). Thus, for example, a person who spits on a sidewalk on the other side of town, see Bedford Ord. 531.01, or violates any other law anywhere in Bedford, will have their behavior attributed to their residence, and by extension to the property owner.

50.     The Ordinance is designed to vicariously punish property owners for activity that occurs on their property or that is attributed to someone who lives on their property, even when the property owner was not involved in the perceived violation.

---

[20] Bedford City Council Work Session Minutes, Sept. 5, 2017.

51.     Whenever more than two perceived violations of any non-traffic law are associated with a property or a resident within a 1 year period, Bedford's Ordinance provides that the property owner faces escalating punitive fines up to $1000. These fines can be certified as a lien on the property. 511.12(b).

52.     Under sections 501.99 and 511.99, the property owner is also potentially subject to a first degree misdemeanor charge and 180 days in jail.

53.     Bedford's Ordinance gives a property owner only 10 days to appeal a fine. 511.12(b)(3). To avoid paying an assessed fine, the property owner must show both that they did not know of the alleged nuisance activity and that they "promptly took all actions necessary to abate the nuisance including, without limitation, compliance with the requirements of Ohio R.C. 5321.17(C) and 5321.04(A)(9)," which relate to the eviction of tenants. 511.12(b)(3)(B).

54.     When a rental property is deemed to be a nuisance, the most common response for a property owner is to evict the tenant. Because of the 2017 amendment, the tenant will not receive notice of the nuisance designation and or be allowed to appeal.

**Bedford Enforces the Ordinance in an Unconstitutional and Discriminatory Manner**

**A. Bedford Targets People Who Seek Police Assistance Including Crime Victims**

55.     Bedford primarily uses the Ordinance to target residents who seek police assistance, including when they are reporting domestic violence or other crimes against them or someone close to them. This application is commonly used to penalize residents of color, women, and people with disabilities who seek police assistance.

56.     Based on nuisance records from the last several years, one of the most common offenses that will trigger Bedford's Ordinance is domestic violence. Indeed, over half of the nuisance letters that Bedford sent in recent years were based on domestic violence.[21]

57.     Bedford's Ordinance and its enforcement regularly deem survivors of crimes as a nuisance if the crime takes place on their property. Indeed, the original Ordinance specifically stated that domestic violence was a nuisance offense even when the offender was not a resident of the property.

58.     In particular, Bedford has aggressively targeted people who call the police for assistance as in the following instances:

    a.     Bedford sent a nuisance letter in 2017 to the owner of a rental property when police responded there twice: (1) when the tenant's male "friend pulled her hair and won't leave" and (2) when a neighbor complained about a group making noise outside, but "all [was] quiet on arrival."

    b.     In 2018, Bedford sent a nuisance letter after a worried mother complained that her child was physically assaulted by her child's father, and wanted to press charges against the father for abuse.

    c.     In one instance, Bedford targeted Black youth and domestic violence survivors in the same letter. In 2015, Bedford police threatened the owner of a rental property with a nuisance designation because (1) a Black child they believed to reside at the property was at the library after he had been banned from it and (2) a woman resident requested police responses when her boyfriend committed acts of violence against her at and away from the property.

---

[21] *Id.* at 11.

59.  Additionally, Bedford has repeatedly used the Nuisance Ordinance to target properties to penalize residents who call for assistance with a mental health crisis.

    a.  In a 2018 case, a mother was fined $250 under the Ordinance for calling for assistance with her daughter who was bipolar and experiencing a crisis.

    b.  Bedford designated a property as a nuisance in 2017 based on several acts of non-criminal activity that led to requests for police help: (1) a neighbor's phone call about the resident's "psychiatric situation" when the resident had "slit her wrists," (2) a "personal welfare check," conducted at a friend's request, on the resident who had not been able to afford her medications, and (3) the resident's distress over being called "crazy" and her failure to take her medication in several days.

    c.  Bedford also repeatedly used the Ordinance to harass a group home for children with disabilities after the staff sought help for a medical emergency involving a child who "hit his head [and] got his eye split open and is bleeding."  The child had to be transported to the Bedford Medical Center. The City fined the group home $250 and threatened to criminally prosecute the property owners and charge them escalating fines if future medical assistance was required.

60.  Bedford pressures owners of rental properties to abate the alleged nuisance by evicting vulnerable tenants, including women, people of color, and people with disabilities who, in most cases, have done nothing wrong. A failure to abate a nuisance is a criminal offense in Bedford, and property owners can be fined $250 or charged with a first degree misdemeanor.

61.  As noted above, local news media, researchers, and the Fair Housing Center for Rights and Research all raised concerns that Bedford was penalizing survivors of domestic violence and other individuals seeking police support. Instead of responding to these concerns,

Bedford amended the Nuisance Ordinance to make it impossible for tenants to challenge illegal and improper nuisance designations.[22]

## B. Bedford Targets and Disparately Impacts Members of Protected Classes

62.     Bedford's Ordinance was designed to allow discriminatory enforcement. Through enforcement, Bedford intentionally discriminates on the basis of protected characteristics including race, sex, and disability. Moreover, the Ordinance and its application have a disparate impact on t protected classes.

63.     For example, Bedford not only enacted its Ordinance with discriminatory intent on the basis of race, it targets enforcement of the Nuisance Ordinance against Black residents, and has the impact of discriminating on the basis of race.

64.     Bedford police use the Ordinance to target Black residents for activities that are not crimes, and in some cases, that occur away from the residential properties

      a.     For instance, Bedford Police issued a nuisance letter to a rental property in 2017 after responding twice to calls for assistance from a renter of color complaining about her "disrespectful" 17-year-old.

      b.     In 2017 Bedford Police issued a nuisance letter and fined the owner of a rental property $250 after a 16-year-old Black resident was seen walking through a skatepark after curfew and was taken home by the police to his grandmother's apartment.

      c.     Bedford Police issued a nuisance letter to a rental property in 2016 after speaking with a Black man about using foul language.

---

[22] Bedford City Council Work Session Minutes Sept. 5, 2017; Bedford Ordinance 9523-17.

65.     The overwhelming majority of Bedford's Black population are renters, rather than homeowners. Although rental units make up 38% of Bedford's residential properties, 55% of nuisance letters issued by Bedford were directed to the owners of rental property.[23]

66.     This same pattern of discriminatory enforcement can be found for other protected classes as well. For example, as noted above, Bedford routinely penalizes women who call for police assistance to deal with domestic abuse.

67.     Bedford's Ordinance and its pattern of enforcement denies residents of Bedford their constitutionally and statutorily guaranteed right to be free of invidious government discrimination.

**Bedford's Enforcement Places Beverley Somai and her Family at Risk**

68.     Ms. Somai is an Indo- and Afro-Guyanese Woman of Color. She immigrated to the United States with her family over twenty years ago from Guyana and became a naturalized citizen of the United States in 2008.

69.     Ms. Somai is the mother of an adult son who has a developmental disability.

70.     She and her son reside in an apartment unit located in Bedford. Their apartment is subsidized through the Housing Choice Voucher Program ("HCVP") administered by Cuyahoga Metropolitan Housing Authority ("CMHA").

71.     Prior to moving to Bedford, Ms. Somai lived in public housing in Kent, Ohio until she obtained a Voucher to rent an apartment of her choice. She resided in such an apartment in Windham, Ohio, but found the location lacking in educational and employment opportunities.

---

[23] Mead, et al., Who is a Nuisance? Criminal Activity Nuisance Ordinances in Ohio 6 (2017), available at https://ssrn.com/abstract=3067028.

72.     In search of better educational opportunities for her son and employment opportunities for herself, Ms. Somai searched for an apartment in Bedford that accepted participants in the HCVP.

73.     Ms. Somai and her son survive based solely on limited disability income, do not own a vehicle, and rely on school buses and public transportation to get around.

74.     In October 2017, Ms. Somai executed a written lease for their apartment in Bedford that was suitable for herself and her son. It was in close proximity to nature, within easy walking distance to a grocery store, and had a school bus stop for her son at the driveway of the apartment complex.

75.     Upon moving to Bedford, Ms. Somai's son enrolled in a Special Education program for students with disabilities who are over the age of 18 but younger than 22 and, if he is able to stay in the district, is on track to graduate in May 2019.

76.     About two months after moving in, Ms. Somai discovered that another tenant who resides in an apartment directly below hers often played his television and stereo very loudly at all times of the day, including late at night and very early in the morning.

77.     Ms. Somai reported the noisy neighbor to her landlord and to the maintenance man at the apartment complex. Both of them advised her to call the police.

78.     Because her landlord failed to address the noisy neighbor and, instead, advised Ms. Somai to call the police to make noise complaints, Ms. Somai did call the police to report the downstairs neighbor when he played his television and stereo too loud.

79.     Ms. Somai first began reporting the noisy neighbor to the police in November 2017. In response to these initial calls, the police reported that they did observe loud television and stereo coming from the downstairs neighbor's apartment and told him to keep his volume down.

80.     The downstairs neighbor did not heed the police warning and continued to play his television and stereo loudly; in some cases, so loudly that Ms. Somai reported to the police that it was causing her floor to vibrate.

81.     Bedford police never did cite the downstairs neighbor for the noise complaints and so, the neighbor continued to make noise and Ms. Somai continued to call for help.

82.     Beginning in April 2018, the downstairs neighbor began to engage in behavior that intimidated Ms. Somai and her son, including following them to the grocery store and bus stop and back and lurking around their apartment.

83.     Ms. Somai reported this escalation to both her landlord and Bedford police, but in most instances they did not take her seriously.

84.     Instead of helping Ms. Somai, Bedford designated her a nuisance.

85.     The Bedford police pressured Ms. Somai's landlord to pursue eviction first in May 2018 and again in December 2018.

86.     Ms. Somai placed her last call, to date, to Bedford police on December 17, 2018, to report that the downstairs neighbor had followed her and her son to the grocery store after she picked her son up from the school bus stop. After this call, Bedford police contacted Ms. Somai's landlord and pressured the landlord to pursue eviction against Ms. Somai.

87.     Unbeknownst to Ms. Somai, Bedford sent her landlord a letter dated December 19, 2018, stating "[y]ou are hereby notified that it is the intent of the Bedford Police Department to utilize this ordinance in any future police responses to this address that comply with sections 511.12." *See* Nuisance Letter, Exhibit A.

88.     Ms. Somai was not provided with a copy of the letter and was not given any opportunity to respond, object, or appeal the nuisance designation.

17

89.     On December 28, 2018, Ms. Somai's landlord served her with a notice to vacate and attached the December 19, 2018, letter from the Bedford police.

90.     Despite that Ms. Somai had effectively abated the so-called nuisance, by ceasing to make any further calls to the Bedford police after December 17, 2018 (even though her downstairs neighbor continued to engage in the noisy and intimidating behavior), Ms. Somai's landlord nevertheless filed an eviction action in the Bedford Municipal Court on January 25, 2019 which is captioned *JCAST Partnership LLC v. Beverley Somai*, Case 19CVG00394. An eviction hearing is currently set for February 22, 2019, at 8:45am.

91.     Having now learned of Bedford's nuisance designation through her landlord, Ms. Somai is scared to call the police in the future if she needs help. Ms. Somai feels unwelcome in her home and in her chosen city.

92.     Even if Ms. Somai is spared from eviction for the time being, she faces an ongoing risk of eviction if she places any further calls to Bedford police. Based on the application of Bedford's Ordinance to her, she must choose between seeking police assistance to protect her safety and well-being, and keeping her family housed in the residence that she chose.

93.     By enforcing the Nuisance Ordinance against Ms. Somai, Bedford is interfering with Ms. Somai's First Amendment right to petition her government for redress of grievances.

94.     Ms. Somai had the opportunity to enroll in home health aide courses the week of February 11, 2019, in order to obtain a certificate to work as a home health aide for seniors but elected not to because she would not have been able to complete the coursework if she is evicted from her home.

95.     Ms. Somai and her son face long-lasting devastating harm should they be evicted as a result of Bedford's enforcement of the Nuisance Ordinance that is punitive and grossly disproportionate.

96.     In addition to the obvious and immediate financial hardship[24], evictions negatively impact the mental and physical health of those affected, the ability to keep one's job, and academic achievement of household members.[25]

97.     If Ms. Somai is evicted, she and her son face the following consequences at least:

    a)     Ms. Somai and her son will be homeless as the result of a sudden involuntary move;

    b)     Ms. Somai's Voucher with CMHA will be in jeopardy as an eviction judgment may be grounds for termination from the federal subsidy program;

    c)     If Ms. Somai is terminated from the HCVP, she will be ineligible for all federally subsidized housing programs for 3-5 years;

    d)     Ms. Somai will have an eviction judgment on her record, which will act as a barrier to her and her son finding housing in the future, in addition to the existing barriers making housing difficult to find for low-income women of color;

    e)     Ms. Somai will have to forgo enrollment in home health aide courses until she has found a new home and, thus, further prolong her pursuit of gainful employment;

---

[24] Matthew Desmond and Rachel Tolbert Kimbro, "Eviction's Fallout: Housing, Hardship, and Health," *Social Forces* 94, no. 1 (Sept. 1, 2015): 295-324, available at https://doi.org/10.1093/sf/sov044.
[25] Robin L. Ersing, Richard Sutphen, and Diane Nicole Loeffler, "Exploring the Impact and Implications of Residential Mobility: From the Neighborhood to the School," *Advances in Social Work* 10, no. 1 (March 19, 2009): 1-18.

f)      Ms. Somai's son will likely have to withdraw as a student in Bedford High School's Special Education program and may not graduate in May 2019 as scheduled;

g)      Ms. Somai's son might age out of eligibility for the Special Education program and never obtain his diploma if his educational progress is further delayed.

98.     For all of this, Ms. Somai has suffered stress and anguish over the threat of losing her housing and the many collateral consequences of an eviction that will last for years to come. She has lost sleep, felt bodily pains as a result of the stress, expended limited funds on bus fare to find resources to assist with her eviction and challenge the enforcement of the Nuisance Ordinance. Even if she is not evicted, she will remain in fear of eviction based on the Ordinance.

## IV.     CLAIMS FOR RELIEF

### COUNT ONE: 42 U.S.C. §1983

### VIOLATION OF THE OHIO CONSTITUTION AND THE FIRST AMENDMENT TO THE U.S. CONSTITUTION: FREE SPEECH & RIGHT TO PETITION

99.     Ms. Somai restates the preceding paragraphs of this Complaint as if fully rewritten herein.

100.    The First Amendment to the United States Constitution protects the freedom of speech and the right to petition the Government for a redress of grievances.

101.    The Ohio Constitution also protects the rights of people to express themselves and their needs. Ohio Const. Art. 1, § 11.

102.    It has been custom and/or policy of the City and its officials while acting under color of state law to deprive Ms. Somai of her constitution

103.    al rights, specifically her guaranteed right to freedom of speech and the right to petition the government for redress of grievances.

20

104. The Nuisance Ordinance and its application to Ms. Somai violates the Constitutional right to freedom of speech and the right to petition the government for redress of grievances.

105. Communications to law enforcement – including (1) reporting physical assault, (2) reporting criminal activity, and (3) filing a complaint with law enforcement – are constitutionally protected activities.

106. The First Amendment also prohibits restrictions on the expression of information or speech, including prohibitions on reporting crime or requesting police service.

107. Additionally, the Nuisance Ordinance is overly broad and infringes on the constitutionally protected right to freedom of speech and the right to petition the government for redress of grievances of Ms. Somai and other residents of Bedford.

108. The City's enforcement of the Nuisance Ordinance based on Ms. Somai's calls to the police for assistance directly violates her right to petition the government to redress grievances and the freedom of speech.

109. The Nuisance Ordinance, particularly as applied to victims of crime, such as domestic violence, or those in need of police assistance, does not advance any compelling government interest and is not narrowly tailored to justify the infringement of the fundamental right to call the police.

110. The deprivation of constitutional rights was a foreseeable consequence of the City's conduct.

111. By virtue of its actions as set forth herein, the City deprived Ms. Somai of her constitutionally protected First Amendment rights.

112.     As a result of the wrongful actions of the City, Ms. Somai has and will continue to sustain impairment of her constitutional rights and damage.

## COUNT TWO: 42 U.S.C. §1983

## VIOLATIONS OF THE FIFTH AND FOURTEENTH AMENDMENTS TO THE U.S. CONSTITUTION: PROCEDURAL DUE PROCESS

113.     Ms. Somai restates the preceding paragraphs of this Complaint as if fully rewritten herein.

114.     It has been custom and/or policy of the City and its officials while acting under color of state law to deprive Ms. Somai of her constitutional rights, specifically her guaranteed right to due process.

115.     The Nuisance Ordinance and its application to Ms. Somai violates the Constitutional right to due process.

116.     The Fourteenth Amendment prohibits states from depriving an individual of due process.

117.     By virtue of its actions as set forth herein, the City violated Ms. Somai's constitutionally protected due process rights.

118.     The deprivation of constitutional rights was a foreseeable consequence of the City's conduct.  In fact, the City intentionally increased a tenant's exclusion in the designation of a property being declared a nuisance in 2017 when the Nuisance Ordinance clarified that tenants could not appeal a nuisance designation.

119.     As a result of the wrongful actions of the City, Ms. Somai has suffered and will continue to sustain impairment of her constitutional rights and damage.

**COUNT THREE: 42 U.S.C. §1983**
**VIOLATIONS OF THE FOURTEENTH AMENDMENT TO THE U.S.**
**CONSTITUTION: EQUAL PROTECTION**

120.     Ms. Somai restates the preceding paragraphs of this Complaint as if fully rewritten herein.

121.     It has been custom and policy of the City and its officials while acting under color of state law to deprive Ms. Somai of her constitutional rights, specifically her guaranteed right to equal protection.

122.     The Nuisance Ordinance and its application to Ms. Somai violates the Constitutional right to equal protection.

123.     The Fourteenth Amendment prohibits states from denying an individual equal protection under the law.

124.     By virtue of its actions as set forth herein, the City violated Ms. Somai's constitutional right to equal protection.

125.     The deprivation of constitutional rights was a foreseeable consequence of the City's conduct.

126.     As a result of the wrongful actions of the City, Ms. Somai has and will continue to sustain impairment of her constitutional rights and damage.

**COUNT FOUR: 42 U.S.C. §§ 3601 et seq.**
**VIOLATION OF THE FEDERAL FAIR HOUSING ACT**

127.     Ms. Somai restates the preceding paragraphs of this Complaint as if fully rewritten herein.

128.     Ms. Somai qualifies for the protections of the Fair Housing Act (FHA).

129.     The City has violated the FHA because the Nuisance Ordinance on its face and as applied disparately impact protected classes, including but not limited to Ms. Somai.

130.    The City has violated the FHA by adopting the Nuisance Ordinance with the intent of discriminating on the basis of protected characteristics.

131.    The City has violated the FHA by intentionally using the Nuisance Ordinance to harass and discriminate against Ms. Somai on the basis of her membership in a protected class.

132.    In addition, Bedford has deprived the residents of the City as well as potential residents of the City of their right to reside in an integrated community consisting of different races, genders and people with and without disabilities.

133.    As a result of the City's violation of the FHA, Ms. Somai has suffered and will continue to suffer injury.

## COUNT FIVE: OHIO R.C. §§ 4112.02(H)
## VIOLATION OF OHIO'S FAIR HOUSING ACT

134.    Ms. Somai restates the preceding paragraphs of this Complaint as if fully rewritten herein.

135.    Ms. Somai is entitled to enforce her rights under Ohio's Fair Housing Act, R.C. § 4112.02(H).

136.    The City, as a political subdivision of the State of Ohio is a "person" required to comply with Ohio's Fair Housing Act R.C. § 4112.01(A)(1).

137.    The Ohio fair housing laws also bar practices that make housing unavailable or otherwise discriminate based on protected classes.

138.    The Nuisance Ordinance violates Ohio law and has harmed Ms. Somai as set forth above.

139.    Accordingly, Ms. Somai has suffered and will continue to suffer deprivation of her rights under Ohio law.

140.   The City's actions are illegal, violate R.C. §4112.02(H) and constitute discriminatory housing practices.

## V.     **PRAYER FOR RELIEF**

WHEREFORE, Ms. Somai seeks:

(a)     A declaration that the Nuisance Ordinance is unconstitutional and/or unlawful as written and/or as applied and is, therefore, null and void;

(b)     Preliminary and/or permanent injunctive relief, including an order enjoining enforcement of the Nuisance Ordinance and an order directing the City of Bedford, its officers, employees, agents, successors and all other persons in active concert or participation with it, to take all affirmative steps to ensure its compliance with the Fair Housing Act and 4112.02(H) including steps to prevent the recurrence of any discriminatory conduct and to eliminate to the extent practicable the effects of its unlawful housing practices as described herein;

(c)     Compensatory damages;

(d)     Attorney's fees and costs and

(e)     Any further declarative, injunctive, financial or other equitable relief this Court deems equitable, just and appropriate.

Respectfully submitted,

*/s/ Sara E. Bird*
Sara E. Bird (0096545)
Jennifer E. Sheehe (0084249)
The Legal Aid Society of Cleveland
1223 West Sixth Street
Cleveland, Ohio 44113
Ph. (216) 861-5407 – SEB
Ph. (440) 210-4521 – JES
Fax (216) 861-0704
sara.bird@lasclev.org
jsheehe@lasclev.org

Freda J. Levenson (0045916)
Elizabeth Bonham (0093733)
Joseph Mead (0091903)
American Civil Liberties Union of Ohio Foundation
4506 Chester Avenue
Cleveland, OH 44103
(614) 586-1958
ebonham@acluohio.org
attyjmead@gmail.com
flevenson@acluohio.org

**Counsel for Plaintiff Beverley Somai**

## JURY DEMAND

Plaintiff hereby demands a trial by the maximum number of jurors permitted by law as to all issues in this action.

/s/ Sara E. Bird
Sara E. Bird (0096545)
Jennifer E. Sheehe (0084249)
Elizabeth Bonham (0093733)
Joseph Mead (0091903)
Freda J. Levenson (0045916)