Exhibit D

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

Beverley Somai and the Fair Housing          :
Center for Rights & Research,                :          Case No. 1:19-cv-373
                                             :
            Plaintiffs,                      :
                                             :          Judge Kathleen B. Burke
      v.                                     :
                                             :
City of Bedford, Ohio,                       :          JURY TRIAL DEMANDED
                                             :
            Defendant.                       :

**SECOND AMENDED COMPLAINT**

**INTRODUCTION**

1.      This litigation challenges the City of Bedford, Ohio's ("Bedford's" or the "City's")

enactment and aggressive enforcement of its discriminatory local nuisance ordinance (the

"Nuisance Ordinance" or "Ordinance") — a law that penalizes the City's residents when they or

someone near their home calls the police for help. (*See* Bedford Ord. 511.12, attached as Exhibit

A.)

2.      Under the Ordinance, Bedford can designate someone's home as a nuisance if two

perceived violations of any law, except for traffic violations, occur near their home or involve a

resident of the home. Ex. A (nuisance designation includes conduct "on properties in the City of

Bedford or involving an offender residing at a property within the City.").

3.      In practice, the City enforces the Ordinance when someone calls for police services

near a rental property, or when a call to the police merely "involve[s]" a renter anywhere in

Bedford. After two such calls in one year—for any reason—the Bedford Police may send a letter

to the tenant's landlord, threatening fines or criminal prosecution against him. The landlord may evade penalty if he abates the nuisance—i.e., evicts the tenant.

4.      The Nuisance Ordinance does not distinguish between people committing crimes, victims of crime, or people calling to report potential crimes or other emergencies. The Ordinance also does not require convictions for any of the alleged violations of law that trigger its enforcement.

5.      In fact, Bedford's most common application of the Ordinance is to threaten or penalize property owners when their tenants are calling to seek help.

6.      Bedford's Ordinance is one of the harshest of such local laws in the country.

7.      Bedford adopted the Nuisance Ordinance in 2005 with explicit animus towards members of protected classes.

8.      The original 2005 Ordinance sought to exclude Black residents from Bedford, and was partially based on concerns regarding the changing racial demographics of the City.

9.      In addition, the 2005 Ordinance specifically targeted domestic violence and did not exempt domestic violence victims from its enforcement.

10.     Bedford aggressively enforces the Ordinance to target residents, particularly renters, who are people of color, women, Housing Choice Voucher Program participants (who are overwhelmingly people of color and women), single parent or guardian households, and people with disabilities. Bedford's enforcement of the Ordinance jeopardizes these residents' housing even when residents are simply exercising their right to seek police or emergency assistance.

11.     Bedford amended the Nuisance Ordinance in 2017 to specifically deny procedural due process protections to renters whom it designates as nuisances. Bedford now prevents tenants from receiving even the notice that Bedford has designated their home as a nuisance, and deprives

them of any opportunity to contest this designation. Instead, when Bedford deems someone a nuisance, it sends a letter directly to the property owner, telling him to abate the nuisance.

12.     The Ordinance was enacted to discriminate against, is disproportionately enforced against, and disproportionately impacts people in protected classes including women, residents with disabilities, and people of color. The Ordinance puts the people it targets at risk of eviction without notice or a hearing and opportunity to defend themselves.

13.     Plaintiff Beverley Somai ("Ms. Somai"), a woman of color and a resident of Bedford, tried many times to contact the police for help with a neighbor who intimidated her and persistently disrupted her family by making loud noise at their building. The disruptions particularly disturbed Ms. Somai's child, who is a person with a developmental disability whose symptoms, including anxiety and sleeplessness, were exacerbated by occurrences compelling Ms. Somai to call the police for assistance. Pursuant to the Ordinance, Bedford designated Ms. Somai's rental unit as a nuisance and threatened to fine her landlord as a direct result of her requests for police assistance. Because of this nuisance designation, Ms. Somai faces eviction proceedings and risks loss of her home.

14.     The Ordinance and its enforcement penalize Ms. Somai for exercising her right to speak about her concerns, ask for police assistance, and petition the government for redress of grievances and deter her from doing so in the future.

15.     Moreover, the Ordinance and its enforcement discriminate against Ms. Somai and her household in violation of the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution and the fair housing laws of Ohio and the United States.

16.     Further, the Ordinance and its enforcement deprive Ms. Somai of due process by denying her notice that calling the police constituted a nuisance and would place her at risk of

eviction, and by denying her any opportunity to contest the application of an Ordinance that impacts her interests.

17.     As a result of the Nuisance Ordinance and its unconstitutional and discriminatory enforcement, Ms. Somai and other similar residents of Bedford face eviction, loss of access to police and emergency services, and continued violations of their rights.

18.     Plaintiff Fair Housing Center for Rights & Research ("Fair Housing Center") is a non-profit organization that assists individuals like Ms. Somai to attain and keep secure housing. The Fair Housing Center also performs research and advocacy to combat housing discrimination in Northeast Ohio, including specifically in Bedford.

19.     The Fair Housing Center has expended significant resources and staff time into research, outreach, and investigation to combat the impact of nuisance ordinances in Bedford and similar cities. The Ordinance has forced the Fair Housing Center to divert its limited resources to fight the Ordinance in the City.

20.     The Nuisance Ordinance does not further any public safety goals or any other legitimate governmental interests. To the contrary, by penalizing victims of crime and other people who seek emergency assistance, the Ordinance deters calls for help and crime reporting, thereby *harming* public safety and public health. The U.S. Department of Housing & Urban Development, the U.S. Department of Justice, and numerous state legislatures have recognized the serious detrimental consequences of nuisance ordinances similar to Bedford's on community security and stability.

21.     Plaintiffs ask this Court to strike down the Nuisance Ordinance and permanently enjoin the City from enforcing it, under the Ohio and United States Constitutions and the state and federal fair housing laws.

## JURISDICTION AND VENUE

22.     This Court has subject matter jurisdiction over this action pursuant to Article III of the Constitution of the United States, 28 U.S.C. § 1331 & 1343, 42 U.S.C. § 3613, and 28 U.S.C. § 1367.

23.     Declaratory relief is authorized by 28 U.S.C. § 2201 and Federal Rule of Civil Procedure 57.

24.     Injunctive relief is authorized by Federal Rule of Civil Procedure 65.

25.     This Court has personal jurisdiction over the Defendant because it is located in the Northern District of Ohio.

26.     Venue of this Court is proper under 28 U.S.C. § 1391(b), as this is the judicial district in which a substantial part of the events giving rise to the claims occurred and is where the property that is the subject of the action is situated.

## PARTIES

27.     **Plaintiff Beverley Somai.** Ms Somai is a Woman of Color. She is a resident of Bedford, Ohio where she lives with her son, who is a person with a developmental disability. They rent their apartment with the assistance of a Housing Choice Voucher, also known as a Section 8 voucher. Ms. Somai and her family are subject to housing instability, including potential eviction and other harms, based on the Nuisance Ordinance.

28.     **Plaintiff Fair Housing Center for Rights & Research.** The Fair Housing Center is a 501(c)3 non-profit fair housing agency whose mission is to protect and expand fair housing rights, eliminate housing discrimination, and promote integrated communities in Northeast Ohio, including in the City of Bedford. It was first established in 1983 and is based in Cleveland, Ohio. To effectuate its goals, the Fair Housing Center provides a range of services, including research on housing and lending patterns in Northeast Ohio, fair housing law seminars and events, systemic

5

and complaint-based housing discrimination testing, and assistance to housing discrimination victims during the administrative complaint process. Relevant to the instant case, the Fair Housing Center has engaged in extensive research and outreach related to the Nuisance Ordinance, including most recently with respect to the Ordinance's impact on domestic violence survivors and individuals with disabilities.

29.     **Defendant City of Bedford.** The City is a chartered municipal corporation and body politic operating under the Laws of the State of Ohio and is situated wholly within Cuyahoga County, Ohio. Bedford enacted the Nuisance Ordinance and is responsible for its continued enforcement.

<u>**FACTS**</u>

<u>**Bedford Adopted Its Nuisance Ordinance with Discriminatory Purpose**</u>

30.     Bedford is an inner-ring suburb that shares its western border with the east side of Cleveland. Before the late 1990s, the residents of Bedford were predominantly white, middle-class homeowners. The residents of Cleveland's east side were predominantly Black during this period, and Cleveland's east side continues to have a majority Black population.

31.     Bedford's racial demographics have changed dramatically over the last couple of decades, as Black residents have moved over the urban border.

32.     In 1990, Bedford had a population of 14,822, including 14,015 residents who identified as only white and 671 residents who identified as only Black.[1]

---

[1] Census 1990, Social and Economic Characteristics Ohio, Table 7 Race and Hispanic Origin at p. 35, *available at* https://www.census.gov/prod/cen1990/cp2/cp-2-37-1.pdf (last visited Feb. 16, 2019).

33.     In 2000, the population of 14,214 included 11,231 residents who identified as only white and 2,506 residents who identified as only Black.[2]

34.     By 2010 Bedford saw a decreased total population of 13,074, of which 7,051 residents identified as only white and 5,479 residents identified as only Black.[3] Today, Black residents make up the majority of Bedford's population.

35.     Of Bedford's Black residents, 73% were renters when Bedford enacted its law. Of Bedford's white residents, only 30% were renters.[4]

36.     Even though Black residents currently make up a majority of Bedford's residents, Bedford's city government and police department remain predominantly white.

37.     In 2005, when Bedford enacted its Nuisance Ordinance, the Mayor was white, and the City Council was comprised of all white members. The Mayor and City Council remain all white.[5]

38.     The Bedford Police Department is about 97% white.[6]

39.     Against this backdrop of an increasing Black population and as a direct response to it, Bedford first enacted the Nuisance Ordinance as Ord. 7702.05 in May 2005.

---

[2] Census 2000, Ohio: 2000 Summary Population and Housing Characteristics, Table 3 Race and Hispanic or Latino at p. 104, available at https://www.census.gov/prod/cen2000/phc-1-37.pdf (last visited Feb. 15, 2019).
[3] Census 2010, available at https://factfinder.census.gov/faces/tableservices/jsf/pages/productview.xhtml?src=bkmk.
[4] U.S. Census Bureau, American Fact Finder, Bedford, Ohio, TENURE (WHITE ALONE HOUSEHOLDER) Universe: Occupied housing units with a householder who is White alone 2005-2009; Bedford, Ohio, TENURE (BLACK ALONE HOUSEHOLDER) Universe: Occupied housing units with a householder who is Black alone 2005-2009.
[5] Bedford City Council Website, *available at* https://bedfordoh.gov/departments/city-council/ (last visited Feb. 15, 2019).
[6] Nick Castele, "Diversity a Challenge for Suburban Police Departments in Cuyahoga County," WCPN Ideastream, Aug. 29, 2014, available at https://www.ideastream.org/news/diversity-a-challenge-for-suburban-police-departments-in-cuyahoga-county (last visited Feb. 15, 2019).

40. Bedford City Council's meeting minutes leading up to and including the Nuisance Ordinance's enactment demonstrate it was passed with explicit animus towards and with the purpose of excluding Black residents from Bedford.

41. At a City Council meeting on April 18, 2005, after noting Bedford's changing racial dynamics, a community member asked what the City was going to do "as far as addressing the mixture of the community," and stated that he did not want Bedford to become like two nearby cities, Maple Heights and Warrensville Heights. These cities are majority Black.[7]

42. The Mayor and City Council responded to these concerns at the May 2, 2005 City Council meeting before voting to pass the Nuisance Ordinance:

> Mayor Pocek said one of the things we take pride in is middle class values. We believe in those middle-class values of neighborhoods where people can go home and their home is their castle and feel safe. If you want to go out onto Wandle Avenue at 9:30 p.m. and walk around the block, you should not have any fear. We take pride in that. *We believe in neighborhoods not hoods. We will do everything we can to maintain those quality of life issues*. . . . The Mayor sincerely believes that the person that comes of the inner city is coming for those reasons. The people who do not and bring those values out here, the values of the gang or of drugs, that will not happen here. *That is one of the reasons we passed that nuisance law tonight*. . . . Mayor Pocek said he has made mention of the students walking down the streets and *these are predominantly African American kids who bring in that mentality from the inner city* where that was a gang related thing by staking their turf. *We are trying to stop that*.[8]

43. The Nuisance Ordinance was adopted at the May 2, 2005 meeting by the unanimous vote of the all-white City Council.[9]

44. The official preamble to the 2005 Ordinance alluded to the concerns about changing demographics, complaining that "responsible homeowners move out of neighborhoods where such activity occurred." (Ord. 7702-05).

---

[7] Bedford City Council Minutes, April 18, 2005.
[8] Bedford City Council Minutes, May 2, 2005 (emphasis added).
[9] *Id.*

8

45.     On or about January 2, 2006, as the Nuisance Ordinance was beginning to be enforced, the Plain Dealer cited the City Mayor's description of "urban immigration" from Cleveland to the suburbs as a "culture clash." The Mayor explained that he supported curtailing this "urban immigration" as part of his "quest to preserve what he and officials in other cities refer to as the suburbs' quality of life. It results from class friction in neighborhoods where the population is increasingly poor and, in many cases, [B]lack."[10]

46.     This news report cited Bedford's Nuisance Ordinance as a device that Bedford's government used to combat the so-called "urban immigrant." The article quoted a Black Bedford resident lamenting that during the same time period, Bedford took down all of its outdoor basketball hoops because, as the reporter summarized Bedford's concern, "families were intimidated by crowds of young [Bl]ack males who blasted music and cursed."[11]

47.     Later, a year after enacting the Nuisance Ordinance, Bedford's Mayor bragged to the Mayor of nearby Campbell, Ohio, that the Ordinance "really solved a lot of their problems with section 8," referring to the federal Housing Choice Voucher Program ("HCVP") (of which Plaintiff Ms. Somai is a participant).[12]

48.     It is widely recognized that opposition to HCVP participants is commonly coded language for opposition to racial minorities.[13] The phrase "Section 8" is often considered to be a racial slur.[14]

---

[10] Thomas Ott, "Urban Immigrants Bring a Culture Clash to Older Suburbs," The Plain Dealer, 2006 WLNR 61813 (Jan. 2, 2006).
[11] *Id.*
[12] Campbell, Ohio City Council Minutes, Oct. 4, 2005.
[13] *Jones v. Travelers Casualty Insurance Company of America*, No. C-13-02390, 2015 WL 5091908, at *2 (N.D. Cal., May 7, 2015).
[14] *United States v. City of Parma, Ohio*, 494 F. Supp. 1049, 1071 (N.D. Ohio, 1980) (opposition to "section 8" was evidence of racial animus); Emily Badger, "How Section 8 Became a 'Racial Slur,'" Washington Post, June 15, 2015, available at

49.     Black renters using the HCVP administered by Cuyahoga County Metropolitan Housing Authority ("CMHA") make up 89.6% of the program's participants overall, and 95.8% of the HCVP renters in Bedford.[15]

50.     Households headed by women like Ms. Somai also make up 82.5% of CMHA's Voucher Program, and over 85% of voucher households in Bedford.[16]

51.     As enacted in 2005, the original version of the Nuisance Ordinance also specifically penalized domestic violence survivors. The Ordinance included the following as a nuisance activity:  "Assault in violation of Section 537.03 and/or domestic violence in violation of Section 537.14 provided that the offender is a resident of the premises where the assault or domestic violence occurs or an invited guest of a resident of said premises." Ordinance No. 7702-05 (codified at 511.12(a)(3)).

52.     The 2005 Ordinance provided no exemption for the victims of assault or domestic violence. It therefore authorized penalties to be imposed on residents who sought police protection because they were the victims of assault or domestic violence.

53.     In fact, one resident who spoke up at the Council Meeting when the 2005 Ordinance was discussed urged the Council: "If you have two call outs for domestic violence, that warrants an eviction instead of getting this tied up in courts and assessing taxes that take forever."

54.     Blaming and stereotyping of domestic violence survivors, the majority of whom are women, as being responsible for the violence perpetrated against them is a form of

---

https://www.washingtonpost.com/news/wonk/wp/2015/06/15/how-section-8-became-a-racial-slur/?noredirect=on&utm_term=.e0ca371e2629 (last visited Feb. 15, 2019).
[15] CMHA HCVP Demographic Report by Municipality, Jan. 2, 2016, available at https://www.cmha.net/webshare/docs/aboutus/DemogRptHCVP.pdf (last visited Feb. 15, 2019).
[16] *Id.*

discrimination that many women domestic violence survivors experience when seeking police and emergency assistance.

55.     While the Nuisance Ordinance was subsequently amended to broadly encompass any two violations of law, the City continues to carry out its original purpose of targeting domestic violence. As discussed *supra*, the City routinely enforces the Ordinance against domestic violence victims.

### Bedford Progressively Amended its Ordinance to Make it Harsher

56.     In 2014, Bedford City Council approved two separate amendments to broaden and intensify the Nuisance Ordinance.[17]

57.     The amendments resulted in four major changes. First, the City increased the scope of the Ordinance to include *any* offense under state or local law, except traffic violations. The prior version used a list of many specific offenses, while the amended Ordinance encapsulates almost all offenses. Second, the City expanded liability to allow a nuisance designation even when the resident committed an offense somewhere other than the property. Third, the City increased the civil fees associated with violation. Finally, the City increased the criminal penalty to a first degree misdemeanor.[18]

58.     In 2016 and 2017, academic researchers, advocates, and news media widely discussed the legal defects of criminal activity nuisance ordinances, specifically analyzing Bedford's Ordinance. These advocates put Bedford on notice of these issues, including how the Ordinance penalized people for seeking emergency assistance and discriminated against people of color, women domestic violence victims, individuals with disabilities, and others.

---

[17] Bedford Ordinances 9187-14 and 9159-14.
[18] *Id.*

59.     For example, a November 2017 study released by researchers at Cleveland State University and the ACLU of Ohio discussed Bedford's ordinance at length.[19] The study found that more than 50% of the nuisance letters sent by Bedford during the study period involved domestic violence; that renters were overrepresented in nuisance letters; that the City sent nuisance letters in response to residents' mental health crises; and that the City sent letters based on extremely minor and even non-criminal behavior by youth. The study was covered extensively in local media. The Cleveland Plain Dealer ran a story on its front page. Several local television stations discussed the report during the news hour. This study and its findings was also discussed in a New York Times opinion piece, "When calling 911 makes you a nuisance," published in November 2017. In addition, in May 2017, the Fair Housing Center sent a letter to Bedford's City Manager advising him that the Nuisance Ordinance raised discrimination concerns under the Fair Housing Act.

60.     Instead of responding to the legal defects in the Ordinance, Bedford doubled down. The City amended the Ordinance again in 2017 for one narrow purpose: to deny renters any notice that the Ordinance has triggered against them. Now, the Ordinance specifies that only property owners—and not the tenants impacted by the nuisance "abatement"—receive notices of intent to enforce the Ordinance and have the opportunity to appeal any nuisance designation.[20]

61.     In debating the 2017 amendment, a Bedford City Council member expressed a desire to "have the verbiage cleaned up so the warning letters, billings and/or any assessments would be mailed directly to the property owner; not the tenant. The Council had no issues with the request."[21]

---

[19] Mead, et al., Who is a Nuisance? Criminal Activity Nuisance Ordinances in Ohio, at 11 (2017), available at https://ssrn.com/abstract=3067028.
[20] Bedford City Council Work Session Minutes Sept. 5, 2017; Bedford Ordinance 9523-17.
[21] Bedford City Council Work Session Minutes, Sept. 5, 2017.

### The Current Version of Bedford's Ordinance is Facially Unlawful

62.     Bedford's Nuisance Ordinance is now among the broadest and harshest of such local laws in the country.

63.     Unlike most criminal activity nuisance ordinances that clearly identify specific criminal offenses that are considered nuisances, Bedford now considers "any violation of a City of Bedford ordinance or the Ohio Revised Code excluding traffic violations" to be a nuisance. Ex. A. The Ordinance does not, on its face, limit its scope to criminal violations.

64.     Violation of the Ordinance also does not require a criminal conviction. The Ordinance allows the mere allegation of a violation of any law to be used to deem a property a nuisance.

65.     The nuisance designation is triggered either when any perceived violation occurs on a property *or* when the perceived violation "involves an offender residing at a property." *Id.* Thus, for example, a person who spits on a sidewalk on the other side of town, *see* Bedford Ord. § 531.01, or violates any other law anywhere in Bedford, could have their behavior attributed to their residence, and by extension to the property owner.

66.     The Ordinance is designed to vicariously punish property owners for activity that occurs on their property or that is attributed to someone who lives on their property, even when the property owner was not involved in the perceived violation.

67.     Whenever more than two perceived violations of any non-traffic law are associated with a property or a resident within a one-year period, Bedford's Ordinance provides that the property owner faces escalating punitive fines up to $1,000. These fines can be certified as a lien on the property. Ex. A.

68. Under sections 501.99 and 511.99 in Bedford's Codified Ordinances, the property owner is also potentially subject to a first-degree misdemeanor charge and 180 days in jail.

69. Bedford's Ordinance gives a property owner only ten days to appeal a fine. *Id.* § (b)(3). To avoid paying an assessed fine, the property owner must show both that they did not know of the alleged nuisance activity and that they "promptly took all actions necessary to abate the nuisance including, without limitation, compliance with the requirements of Ohio R.C. 5321.17(C) and 5321.04(A)(9)," which relate to the eviction of tenants. *Id.* §(b)(3)(B).

70. When a rental property is deemed to be a nuisance, the most common response for a property owner is to evict the tenant, as contemplated by the Nuisance Ordinance. Because of the 2017 amendment, the tenant will not receive notice of or be allowed to appeal the nuisance designation.

## Bedford Enforces the Ordinance in an Unconstitutional and Discriminatory Manner

### A. Bedford Targets People Who Seek Police Assistance Including Crime Victims and Individuals With Disabilities

71. Bedford primarily uses the Ordinance to target residents who seek police assistance and emergency response, including when they are reporting domestic violence or other crimes against them or someone close to them. The City's enforcement disproportionately penalizes women and residents of color who are seeking police and emergency services, and penalizes residents with disabilities, including disabled people living in group homes.

72. Based on nuisance records from the last several years, one of the most common offenses that will trigger Bedford's Ordinance is domestic violence. Over half of the nuisance letters that Bedford sent in recent years were based on domestic violence.[22]

---

[22] Mead, et al., Who is a Nuisance? Criminal Activity Nuisance Ordinances in Ohio, at 11 (2017), available at https://ssrn.com/abstract=3067028.

14

73.     Bedford's Ordinance and its enforcement regularly deem crime survivors to be nuisances if the crime takes place on their property. Indeed, the original Ordinance specifically stated that domestic violence was a nuisance offense even when the offender was not a resident of the property.

74.     In particular, Bedford has aggressively targeted people who call the police for assistance, as in the following instances:

     a.     In 2017, Bedford sent a nuisance letter to the owner of a rental property when police responded there twice: (1) when the tenant's male "friend pulled her hair and won't leave," and (2) when a neighbor complained about a group making noise outside, but "all [was] quiet on arrival."

     b.     In 2018, Bedford sent a nuisance letter after a worried mother complained that her child was physically assaulted by her child's father, and wanted to press charges against the father for abuse.

     c.     In one instance, Bedford targeted Black youth and domestic violence survivors in the same letter. In 2015, Bedford police threatened the owner of a rental property with a nuisance designation because: (1) a Black child they believed to reside at the property was at the library after he had been banned from it, and (2) a woman resident requested police assistance when her boyfriend committed acts of violence against her at and away from the property.

75.     Additionally, Bedford has repeatedly used the Nuisance Ordinance to target properties to penalize residents who call for assistance with mental health crises, as in the following instances:

15

a.     In 2018, the City issued several fines, in the total amount of $2,000 dollars, to the operator of a group home for individuals with development and intellectual disabilities, based on calls for assistance for a client in crisis. The City penalized the operator, despite that the City's records noted that the client required medical care for self-inflicted injuries and that the client has an intellectual disability and several mental health diagnoses. In its enforcement letters, City officials informed the group home operator that the fines would be waived if the staff "send[s] me proof that you are evicting [the disabled resident]." When the group home staff presented a copy of a new lease executed by the disabled resident for an apartment in Cleveland, the fines were waived.

b.     In 2018, the City issued a $250 fine under the Ordinance against a mother for calling for assistance with her daughter with bipolar disorder who was experiencing a crisis.

c.     In 2018, the City issued a warning letter based on calls for assistance by a resident who was repeatedly described by the BPD as a "mental subject." The City's call reports also noted that the caller "sounds very erratic and mental," and that "history shows mental history."

d.     Between 2016 and 2017, Bedford repeatedly used the Ordinance to fine a group home for children with disabilities after the staff sought assistance with mental health crises and medical emergencies. The City issued an enforcement letter after the group home staff sought help for a medical emergency involving a child who "got pushed into a chair by another juvenile and hit his head. . . . [and] got his eye split open and [wa]s bleeding." The child had to be transported to the Bedford Medical Center. The City fined

16

the group home $250, as well as threatened to criminally prosecute the property owners and issue escalating fines if they required future police assistance.

     e.    In 2016, the City issued a warning letter to a household based on three calls for assistance involving a child who had bipolar disorder and "had not taken his medication."

     f.    In 2016, the City issued a warning letter based on four calls for assistance with mental health crises, three of which were described as a "psychiatric situation." In its reports, the City noted that the calls involved a "mental health client" who was "a schizophrenic male who is bipolar and has autism."

     g.    In 2015, the City issued a warning letter based on calls for assistance with mental health crises, including: (1) a neighbor's phone call about the resident's "psychiatric situation" when the resident had "slit her wrists;" (2) a "personal welfare check," conducted at a friend's request, on the resident who had not been able to afford her medications; and (3) the resident's distress over being called "crazy" and her failure to take her medication in several days.

76.    Bedford pressures owners of rental properties to abate the alleged nuisance by evicting vulnerable tenants—including women, people receiving subsidized housing, people of color, and people with disabilities—who, in most cases, have done nothing wrong. A failure to abate a nuisance is a criminal offense in Bedford, and property owners can be fined $250 or charged with a first-degree misdemeanor.

77.    As noted above, local news media, researchers, and the Fair Housing Center all raised concerns that Bedford was penalizing survivors of domestic violence, residents with disabilities, and other individuals seeking police support. Instead of responding to these concerns,

Bedford amended the Nuisance Ordinance to make it impossible for tenants to challenge illegal and improper nuisance designations.[23]

## B. Bedford Targets and Disparately Impacts Members of Protected Classes

78.     Bedford's Ordinance was designed to allow for discriminatory enforcement. Through its discriminatory enforcement, Bedford intentionally discriminates on the basis of protected characteristics, including race, disability, and sex. Moreover, the Ordinance and its application have a disparate impact based on race, disability, and sex.

79.     The federal Fair Housing Act makes it unlawful to deny housing or make housing unavailable to any person "because of race, color, religion, sex, familial status, or national origin."[24]   The Fair Housing Act also prohibits discrimination in the "terms, conditions, or privileges of sale or rental of a dwelling, or in the provision of services or facilities in connection therewith" for the same reasons.[25]   The Fair Housing Amendments Act of 1988 extended these protections to persons with disabilities.[26] Discrimination prohibited by the Fair Housing Act also includes "a refusal to make a reasonable accommodation in rules, policies, practices, and services, when such accommodation may be necessary to afford a person with a disability an equal opportunity to use and enjoy a dwelling."[27]

80.     For the purposes of the Fair Housing Act, disability includes: (1) "a physical or mental impairment which substantially limits one or more . . . major life activities"; (2) "a record of having such an impairment"; or (3) when a person is "regarded as having such an impairment."[28]

---

[23] Bedford City Council Work Session Minutes Sept. 5, 2017; Bedford Ordinance 9523-17.
[24] 42 U.S.C. § 3604(a).
[25] *Id.* § 3604(b).
[26] *Id.* § 3604(f)(2).
[27] *Id.* § 3604(f)(3)(B).
[28] *Id.* § 3602(h).

A physical or mental impairment includes, but is not limited to, "[a]ny mental or physiological disorder," including learning disabilities, autism, "emotional or mental illness," alcoholism, and "drug addiction (other than addiction caused by current, illegal use of a controlled substance)."[29]

81. Federal courts have repeatedly recognized that the FHAA's protections apply to individuals with a mental illness,[30] such as depression and anxiety disorder,[31] as well as to individuals with a developmental disability.[32] The FHAA's protections also extend to those in recovery from alcoholism or drug addiction.[33] A defendant may violate the Fair Housing Act through either intentional discrimination or through facially neutral conduct that has an unjustified disparate impact or effect based on one or more protected classifications, such as race, disability, or sex.[34]

82. The City's Ordinance makes housing unavailable to tenants who are evicted, threatened with eviction, or otherwise penalized because of its provisions. The Ordinance discriminates against those tenants, as well as other tenants who are chilled from seeking police assistance or emergency services for fear of triggering the Ordinance's penalties, interfering with the privileges of renting and the provision of municipal services related to renting.

---

[29] 24 C.F.R. § 100.201(a)(2).

[30] *See, e.g.*, *Step By Step, Inc. v. City of Ogdensburg*, 176 F. Supp. 3d 112, 124–25 (N.D.N.Y. 2016).

[31] *See, e.g.*, *Castillo Condo. Ass'n v. U.S. Dep't of Hous. & Urban Dev.*, 821 F.3d 92, 98 (1st Cir. 2016).

[32] *Marbrunak, Inc. v. City of Stow*, 974 F.2d 43, 47 (6th Cir. 1992) (holding that a municipal zoning ordinance's extensive safety protections for family homes housing indiivduals with developmental disabilities violated the Fair Housing Amendments Act).

[33] *See, e.g.*, *Valley Hous. LP v. City of Derby*, 802 F. Supp. 2d 359, 383 (D. Conn. 2011) (citing *Reg'l Econ. Cmty. Action Program, Inc. v. City of Middletown*, 294 F.3d 35, 46 n.2 (2d Cir. 2002)).

[34] *See Tex. Dep't of Hous. & Cmty. Affairs v. Inclusive Cmtys. Project*, 135 S. Ct. 2507 (2015); *see also* 24 C.F.R. § 100.500 *et seq.*

83.     In addition to enacting its Ordinance with a discriminatory intent on the basis of race, the City targets its enforcement of the Ordinance against Black residents, and its enforcement of the Ordinance disproportionately impacts Black residents. Accordingly, Black residents disproportionately face eviction, threats of eviction, and other penalties as a result of the Ordinance. The City's Ordinance thus makes housing unavailable, discriminates in the privileges of renting, and discriminates in the provision of municipal services related to rental housing, because of race and color.

84.     The Bedford Police Department uses the Ordinance to target Black residents for activities that are not crimes, and in some cases, that occur outside of the residents' homes.

    a.     In 2017, the Bedford Police Department issued a nuisance letter to a rental property after responding twice to calls for assistance from a Black renter complaining about her "disrespectful" 17-year-old.

    b.     In 2016, the Bedford Police Department issued a nuisance letter and fined the owner of a rental property $250 after a 16-year-old Black resident was seen walking through a skateboard park after curfew and was taken home by the police to his grandmother's apartment.

85.     In 2016, the Bedford Police Department issued a nuisance letter to a rental property after an officer "spoke with a Black male about shouting vulgar/profane language." This same pattern of discriminatory enforcement can be found for other protected classes as well. Specifically, the City disproportionately enforces the Ordinance against survivors of domestic

violence—the vast majority of whom are women—for seeking police assistance and emergency services related to the abuse they experienced.[35]

86.    Over an 18-month period, the City issued at least 47 nuisance abatement letters pursuant to the Ordinance.  Based on a review of Bedford's enforcement of the Ordinance, over half of those nuisance abatement letters were sent in response to domestic violence incidents.[36] Accordingly, the City's enforcement of the Ordinance imposes an unnecessary disparate impact against women, in violation of the Fair Housing Act's protections.

87.    The City's enforcement of the Ordinance has a discriminatory effect on residents with disabilities or perceived disabilities, including disabled people who live in group homes. Based on its discovery responses, the City sent at least 36 nuisance abatement warning and/or fine letters pursuant to the Ordinance where the responding officers documented mental health concerns. Accordingly, residents with disabilities face a heightened risk of eviction, threats of eviction, and other penalties as a result of the Ordinance.

88.    Additionally, the City's Ordinance serves no legitimate purpose. Although the Ordinance purports to promote public safety, the Ordinance effectively decreases safety by discouraging residents and property owners from contacting police assistance and emergency services. Moreover, the Ordinance results in general distrust of law enforcement and government bodies by penalizing residents for utilizing such services.

---

[35] According to a 2015 report from the U.S. Justice Department's Bureau of Justice Statistics, from 1994 to 2010, approximately 80% of victims of intimate partner violence were women. Institute for Women's Policy Research, The Economic Cost of Intimate Partner Violence, Sexual Assault, and Stalking (Aug. 2017), at 4, https://iwpr.org/wp-content/uploads/2017/08/B367_Economic-Impacts-of-IPV-08.14.17.pdf.
[36] Joseph Mead, et al., *Who is a Nuisance? Criminal Activity Nuisance Ordinances in Ohio*, at 11 (2017).

89.     Even if the City's Ordinance increased public safety, this purpose could be achieved through less discriminatory means that do not result in disproportionate penalties, like eviction and other harms, against Black residents, individuals with disabilities, and women.

90.     The City's Ordinance also stands in conflict with various federal laws and guidance documents, further demonstrating that the Ordinance is not the least discriminatory means of effectuating any legitimate purpose.

91.     The United States Department of Housing and Urban Development ("HUD") has issued guidance stating that nuisance ordinances, such as Bedford's Ordinance, that have an unjustified discriminatory impact on survivors of domestic violence violate the Fair Housing Act.[37] HUD's guidance further noted: "Where such a [nuisance ordinance enforcement] practice is challenged and proven to have a disparate impact, the local government would have the difficult burden to prove that cutting off access to emergency services for those in grave need of such services, including victims of domestic violence or other crimes, thereby potentially endangering their lives, safety and security, in fact achieves a core interest of the local government and was not undertaken for discriminatory reasons or in a discriminatory manner."[38]

92.     Furthermore, the United States Congress has recognized that it is improper to evict survivors of domestic violence, sexual assault, dating violence, and stalking because of the abuse

_____

[37] U.S. Dep't of Hous. & Urban Dev., *Office of General Counsel Guidance on Application of Fair Housing Act Standards to the Enforcement of Local Nuisance and Crime-Free Housing Ordinances Against Victims of Domestic Violence, Other Crime Victims, and Others Who Require Police and Emergency Services* (Sept. 13, 2016), at 9, 12, https://www.hud.gov/sites/documents/FINALNUISANCEORDGDNCE.PDF.

[38] U.S. Dep't of Hous. & Urban Dev., *Office of General Counsel Guidance on Application of Fair Housing Act Standards to the Enforcement of Local Nuisance and Crime-Free Housing Ordinances Against Victims of Domestic Violence, Other Crime Victims, and Others Who Require Police and Emergency Services* (Sept. 13, 2016), at 12, https://www.hud.gov/sites/documents/FINALNUISANCEORDGDNCE.PDF.

that they have endured. Through the Violence Against Women Act, Congress barred housing providers that receive federal funds, including Section 8 subsidies, from evicting people due to the abuse they have experienced.[39] Such provisions express a clear federal policy that is inconsistent with the notion that the City's policy of penalizing survivors of domestic violence or stalking is ever appropriate, or that it could be the least discriminatory means of furthering any legitimate government purpose.

93. Access to stable housing is critical to ensuring the long-term safety and security of survivors of domestic violence and other forms of abuse. Indeed, lack of housing is regularly reported by domestic violence survivors as a "primary barrier to escaping abuse."[40]

94. Domestic violence survivors also face an increased risk of eviction due to the abuse committed against them, particularly because of unjust policies like the City's Nuisance Ordinance. A 2005 study found that as many as 11% of all evictions nationwide were evictions of domestic violence survivors due to the abuse they experienced.[41] Additionally, a Michigan-based study of women currently or formerly receiving welfare revealed that women who had experienced recent or ongoing domestic violence were far more likely to face eviction than other women.[42]

---

[39] 34 U.S.C. § 12491.

[40] Nat'l Network to End Domestic Violence, *Housing* (2017), https://nnedv.org/content/housing/. Moreover, in a 2012 report, the National Law Center on Homelessness and Poverty found that, in some parts of the country, one out of four adults experiencing homelessness reported that domestic violence caused their homelessness. Nat'l Law Ctr. on Homelessness & Poverty, *There's No Place Like Home* (Oct. 2012), at 5, https://nlchp.org/wp-content/uploads/2018/10/Theres_No_Place_Like_Home.pdf.

[41] National Law Center on Homelessness & Poverty, Lost Housing, Lost Safety: Survivors of Domestic Violence Experience Housing Denials and Evictions Across the Country (2007), http://www.nlchp.org/content/pubs/NNEDV-NLCHP_Joint_Stories%20_February_20072.pdf.

[42] Richard M. Tolman, Sandra K. Danziger & Daniel Rosen, Michigan Program on Poverty and Social Welfare Policy, Domestic Violence and Economic Well-Being of Current and Former Welfare Recipients (2001).

And a 2019 study published by the Fair Housing Center found that in Northeast Ohio specifically, nuisance ordinances lead to evictions of domestic violence survivors.[43]

95. Congress has also recognized a "strong link between domestic violence and homelessness," through its 2005 and 2013 reauthorizations of the Violence Against Women Act.[44]

96. Penalizing domestic violence survivors for seeking police assistance or emergency services not only jeopardizes their access to housing, but discourages survivors from accessing potentially life-saving aid.

97. Individuals with disabilities also face significant barriers to accessible and affordable housing, forcing many people with disabilities into "homelessness or segregated, restrictive, and costly institutional settings such as psychiatric hospitals, adult care homes, nursing homes, or jails."[45] Since the early 2000s, complaints of disability discrimination have comprised the largest percentage of housing discrimination complaints received by both public and private fair housing enforcement organizations.[46]

98. Individuals with disabilities often face eviction from their housing for reasons related to their disabilities, leading to homelessness and institutionalization.[47] Eviction frequently

---

[43] M. Lepley & L. Mangiarelli, Domestic Violence Survivor Housing Discrimination in Cuyahoga County (Feb. 2019) available at http://www.thehousingcenter.org/wp-content/uploads/2019/03/Domestic-Violence-Discrimination-Study-Final.pdf
[44] 34 U.S.C. § 12471.
[45] Technical Assistance Collaborative, *Priced Out in the United States* (2017), at 8, http://www.tacinc.org/media/59493/priced-out-in-2016.pdf.
[46] Nat'l Fair Hous. Alliance, *The Case for Fair Housing: 2017 Fair Housing Trends Report* (Apr. 2017), at 27, https://nationalfairhousing.org/wp-content/uploads/2017/07/TRENDS-REPORT-2017-FINAL.pdf.
[47] Meghan P. Carter, *How Evictions from Subsidized Housing Routinely Violate the Rights of Persons with Mental Illness*, 5 Nw. J. L. & Soc. Pol'y. 118, 118-19 (2000).

has a far-reaching and lasting impact, including the loss of rental subsidies, stigmatization, and even homelessness.[48]

99.    Access to accessible and affordable housing is central for the well-being of individuals with disabilities and particularly for people who have mental disabilities. Research has consistently demonstrated that "individuals with severe mental illnesses who have adequate housing experience fewer complications and are less likely to have co-occurring disorders, such as substance abuse, that exacerbate mental illnesses," and "are more likely to adhere to their treatment plans, which can help cognition and aid social function."[49]

100.    HUD has also acknowledged that local nuisance or crime-free housing ordinances, like Bedford's Ordinance, may have an unjustified discriminatory impact on individuals with disabilities in violation of the Fair Housing Act.[50]

101.    In addition to extending the Fair Housing Act's protections to individuals with disabilities, the United States Congress has repeatedly recognized the importance of ensuring equal access to housing for individuals with disabilities by enacting Title II of the Americans With Disabilities Act and Section 504 of the Rehabilitation Act of 1973. Congress passed the Americans With Disabilities Act to "provide a clear and comprehensive national mandate for the elimination of discrimination against individuals with disabilities."[51] The City's policy of penalizing people

---

[48] *Id.*

[49] *Id.* at 119.

[50] See *supra* note 34, at 1. U.S. Dep't of Hous. & Urban Dev., *Office of General Counsel Guidance on Application of Fair Housing Act Standards to the Enforcement of Local Nuisance and Crime-Free Housing Ordinances Against Victims of Domestic Violence, Other Crime Victims, and Others Who Require Police and Emergency Services* (Sept. 13, 2016), at 12, https://www.hud.gov/sites/documents/FINALNUISANCEORDGDNCE.PDF.

[51] 42 U.S.C. § 12101(b)(1).

with disabilities is inconsistent with these federal protections and is not the least discriminatory means of furthering any legitimate government purpose.

102. For the purposes of the ADA, disability includes: (1) "[a] physical or mental impairment which substantially limits one or more . . . major life activities"; (2) "[a] record of having such an impairment"; or (3) when a person is "regarded as having such an impairment."[52]

103. Penalizing residents seeking assistance related to their disabilities or the disabilities of their family members jeopardizes the safety and well-being of individuals with disabilities and often results in lasting harm to those affected. Moreover, the City's Nuisance Ordinance discourages residents from seeking assistance with mental health crises or other concerns related to individuals with disabilities, thereby jeopardizing the safety and well-being of Bedford residents.

104. Title II of the Americans With Disabilities Act ("ADA"), 42 U.S.C. §§ 12131, 12132, prohibits discrimination against individuals with disabilities, including people with intellectual disability, cerebral palsy, epilepsy, muscular dystrophy, multiple sclerosis, learning disabilities, traumatic brain injury, major depressive disorder, bipolar disorder, post-traumatic stress disorder, obsessive compulsive disorder, and schizophrenia, and autistic people. Specifically, Title II of the ADA prohibits discrimination against individuals with disabilities in programs and activities.[53] Title II also requires that "a public entity shall administer services, programs, and activities in the most integrated setting appropriate to the needs of the qualified individuals with disabilities."[54]

---

[52] 28 C.F.R. § 35.108(a)(1); *see also id.* § 35.108(d)(2).
[53] 42 U.S.C. §§ 12131, 12132.
[54] 28 C.F.R. § 35.130(d).

105.    As a local government body, the City is a "public entity" under the ADA.[55] Accordingly, the City is subject to liability under the ADA.

106.    Moreover, the ADA's "services, programs, or activities" language "encompasses virtually everything that a public entity does," including the provision of police and emergency services.[56]

107.    The provision of police and emergency services to individuals with disabilities does not require fundamental modifications to the City's programs, nor does it impose an undue burden.

108.    Bedford continued to enforce the Nuisance Ordinance in these discriminatory ways even after scholars, the Fair Housing Center, advocates, and others alerted the City about how its implementation discriminates against people of color, residents with disabilities, and women domestic violence survivors, among other vulnerable groups.

109.    Bedford's Ordinance and its pattern of enforcement denies residents of Bedford their constitutionally and statutorily guaranteed right to be free of invidious government discrimination.

### Injury to the Fair Housing Center

110.    Bedford's enactment and enforcement of its Nuisance Ordinance has injured and is continuing to injure Plaintiff the Fair Housing Center.

111.    The Fair Housing Center's mission is to promote and expand equal housing opportunities and eliminate housing discrimination in Northeast Ohio, including in the City of Bedford. 101. To effectuate its goals, the Fair Housing Center provides counseling, education, and support including direct advocacy, research, preliminary investigation, and assistance in the

---

[55] 42 U.S.C. § 12131(1).
[56] *Johnson v. City of Saline*, 151 F.3d 564, 569 (6th Cir. 1998).

administrative complaint process to those who experience housing discrimination. The Fair Housing Center also engages in activities designed to encourage fair housing practices by educating consumers regarding their rights and professionals regarding their responsibilities under the Fair Housing Act, and by working with elected and government representatives to protect and  improve fair housing and related laws. The Fair Housing Center also conducts research into housing and lending patterns,  and related fair housing matters throughout Northeast Ohio in order to educate government officials, individuals who work in the housing industry, and the public as a whole in furtherance of the Fair Housing Act's goals of prohibiting housing discrimination and taking affirmative measures to undo the effects of past discrimination.

112.    The Fair Housing Center has engaged in extensive research and outreach related to Criminal Activity Nuisance Ordinances in general, and specifically with regard to Bedford's Nuisance Ordinance. For example, in February 2019 the Fair Housing Center published a report detailing the impact of Bedford's and similar ordinances on domestic violence and stalking survivors.[57] The report found that 13% of surveyed survivors of domestic violence were evicted, and 20% were discouraged from calling 911.

113.    Since Bedford enacted its Ordinance, the Fair Housing Center has provided over 100 hours of information and assistance for instances related to more than 13 complaints of housing discrimination in the City. This included complaints related to the Ordinance. This also included complaints related to discrimination on the basis of race, sex, and disability, among other protected classes. In doing so, the Fair Housing Center has spent its limited resources on mitigating the devastating consequences of housing insecurity caused by the City's Ordinance.

---

[57] See *supra* n. 35.

114.    The Fair Housing Center has expended many hours of staff time advocating for residents in Bedford, including through public outreach and outreach to Bedford's city manager and law director.

115.    The Fair Housing Center's core service area of Cuyahoga and Lorain Counties in Northeast Ohio includes more than 1.5 million residents. The Fair Housing Center's research often covers the expanded 6-county Cleveland-Elyria Metropolitan Statistical Area.  The organization performs this work with an operating budget of less than $700,000 and the efforts of 8 full-time and 1 part-time staff members.

116.    The Fair Housing Center's mission has been frustrated as a result of Bedford's enactment and enforcement of the Ordinance.  To counteract Bedford's discriminatory actions and ensure residents of Bedford and surrounding areas know that the Fair Housing Act protects them from housing discrimination because of race, national origin, sex, disability, color, religion, and familial status and that Bedford officials understand their responsibilities under the Fair Housing Act, the Fair Housing Center has had to divert resources it would otherwise have spent furthering its mission to protect and expand fair housing rights, eliminate housing discrimination, and promote integrated communities in the region. The Fair Housing Center has had to divert significant financial resources and staff time to advocacy and education in Bedford.

**Injury to Plaintiff Beverley Somai**

117.    Ms. Somai is an Indo- and Afro-Guyanese Woman of Color who is multi-racial and widely perceived as Black. She immigrated to the United States with her family over twenty years ago from Guyana and became a naturalized citizen of the United States in 2008.

118.    Ms. Somai is the mother of an adult son who has a developmental disability.

119.    She and her son reside in an apartment unit located in Bedford. Their apartment is subsidized through the Housing Choice Voucher Program ("HCVP") administered by Cuyahoga Metropolitan Housing Authority ("CMHA").

120.    Prior to moving to Bedford, Ms. Somai lived in public housing in Kent, Ohio until she obtained a Voucher to rent an apartment of her choice. She resided in such an apartment in Windham, Ohio, but found the location lacking in educational and employment opportunities.

121.    In search of better educational opportunities for her son and employment opportunities for herself, Ms. Somai searched for an apartment in Bedford that accepted participants in the HCVP.

122.    Ms. Somai and her son survive based solely on limited disability income, do not own a vehicle, and rely on school buses and public transportation to get around.

123.    In October 2017, Ms. Somai executed a written lease for their apartment in Bedford that was suitable for herself and her son. It is in close proximity to nature, within easy walking distance to a grocery store, and has a school bus stop for her son at the driveway of the apartment complex.

124.    Upon moving to Bedford, Ms. Somai's son enrolled in a Special Education program for students with disabilities who are over the age of 18 but younger than 22 and, if he is able to stay in the district, is on track to graduate in May 2019.

125.    About two months after moving in, Ms. Somai discovered that another tenant who resides in an apartment directly below hers often played his television and stereo very loudly at all times of the day, including late at night and very early in the morning.

126.    Like many parents of children with developmental disabilities, Ms. Somai tries to maintain a calm and quiet home environment and to minimize unpredictable noise and disruptions.

Ms. Somai was concerned with the impact that the noise and music would have on her son, who is sensitive and reactive to loud noises due to his disability. Accordingly, Ms. Somai decided to seek assistance to resolve the dispute.

127.    Ms. Somai reported the noisy neighbor to her landlord and to the maintenance man at the apartment complex. Both of them advised her to call the police.

128.    Because her landlord failed to address the noisy neighbor and, instead, advised Ms. Somai to call the police to make noise complaints, Ms. Somai did call the police to report the downstairs neighbor when he played his television and stereo too loudly.

129.    Ms. Somai first began reporting the noisy neighbor to the police in November 2017. In response to these initial calls, the police reported that they, too, observed loud television and stereo sounds coming from the downstairs neighbor's apartment and told him to keep his volume down.

130.    The downstairs neighbor did not heed the police warning and continued to play his television and stereo loudly; in some cases, so loudly that Ms. Somai reported to the police that it was causing her floor to vibrate.

131.    Bedford police never did cite the downstairs neighbor for the noise complaints and so, the neighbor continued to make noise and Ms. Somai continued to call for help.

132.    Beginning in March of 2018, the downstairs neighbor began to engage in behavior that intimidated Ms. Somai and her son. The neighbor's behavior included following Ms. Somai and her son to the grocery store and bus stop, and lurking around their apartment.

133.    That same month, Ms. Somai contacted the Bedford Police Department to report that her neighbor had been following her and her son around for several days, which intimidated

Ms. Somai. Ms. Somai reported that her neighbor followed her to the grocery store and "whenever she leaves the house," that her neighbor lurked outside of her apartment.

134.   In April of 2018, Ms. Somai again contacted the Bedford Police Department to report that her neighbor continued to follow and watch her and her son, despite requests to leave them alone.

135.   In May of 2018, Ms. Somai again contacted the Bedford Police Department to report that her neighbor continued to watch and follow her.

136.   Ms. Somai reported this escalation to both her landlord and Bedford police, but in most instances, they did not take her seriously.  Instead, in May of 2018, Bedford police officers advised Ms. Somai to stop calling the police, and then pressured Ms. Somai's landlord to pursue eviction against Ms. Somai through a nuisance letter.

137.   Ms. Somai placed her last call, to date, to Bedford police on December 17, 2018, to report that the downstairs neighbor had followed her and her son to the grocery store after she picked her son up from the school bus stop. After this call, Bedford police contacted Ms. Somai's landlord and pressured the landlord to pursue eviction against Ms. Somai.

138.   Unbeknownst to Ms. Somai, Bedford sent her landlord a letter dated December 19, 2018, stating "[y]ou are hereby notified that it is the intent of the Bedford Police Department to utilize this ordinance in any future police responses to this address that comply with sections 511.12."  (*See* Nuisance Letter, Exhibit B.)

139.   Ms. Somai was not provided with a copy of the letter and was not given any opportunity to respond, object, or appeal the nuisance designation.

140.   On December 28, 2018, Ms. Somai's landlord served her with a notice to vacate and attached the December 19, 2018 letter from the Bedford police.

141.    Despite that Ms. Somai had effectively abated the so-called nuisance, by ceasing to make any further calls to the Bedford police after December 17, 2018 (even though her downstairs neighbor continued to engage in the disturbing and intimidating behavior), Ms. Somai's landlord nevertheless filed an eviction action in the Bedford Municipal Court on January 25, 2019 which is captioned *JCAST Partnership LLC v. Beverley Somai*, Case 19CVG00394.

142.    As a consequence of the first eviction filing, Ms. Somai and her son experienced disruptions in their lives worrying about having to move involuntarily.

143.    Ms. Somai, in order to devote more time to packing up their home and search for alternative housing, postponed enrolling in a course where she could obtain a certification to be a home healthcare aide.

144.    Ms. Somai and her son lived with the very real fear that, because they might have to relocate out of the school district in which her son was receiving special education services, he would not be able to graduate with a special education degree and that he would age out of eligibility for special education.

145.    Having now learned of Bedford's nuisance designation through her landlord, Ms. Somai is scared to call the police in the future if she needs help. Ms. Somai feels unwelcome in her home and in her chosen city.

146.    Even if Ms. Somai is spared from eviction for the time being, she faces an ongoing risk of eviction if she places any further calls to Bedford police. Based on the application of Bedford's Ordinance to her, she must choose between seeking police assistance to protect her and her family's safety and well-being, and keeping her family housed in the residence that she chose.

147. By enforcing the Nuisance Ordinance against Ms. Somai, Bedford is interfering with Ms. Somai's First Amendment right to petition her government for redress of grievances and to free speech.

148. Ms. Somai and her son face long-lasting devastating harm should they be evicted as a result of Bedford's enforcement of the Nuisance Ordinance that is punitive and grossly disproportionate.

149. In addition to the obvious and immediate financial hardship,[58] evictions negatively impact the mental and physical health of those affected, the ability to keep one's job, and academic achievement of household members.[59]

150. If Ms. Somai is evicted, she and her son face the following consequences at least:

   a)   Ms. Somai and her son will be homeless as the result of a sudden involuntary move;

   b)   Ms. Somai's Voucher with CMHA will be in jeopardy as an eviction judgment may be grounds for termination from the federal subsidy program;

   c)   If Ms. Somai is terminated from the HCVP, she will be ineligible for all federally subsidized housing programs for 3-5 years;

   d)   Ms. Somai will have an eviction judgment on her record, which will act as a barrier to her and her son finding housing in the future, in addition to the existing barriers making housing difficult to find for low-income women of color;

---

[58] Matthew Desmond and Rachel Tolbert Kimbro, "Eviction's Fallout: Housing, Hardship, and Health," *Social Forces* 94, no. 1 (Sept. 1, 2015): 295-324, available at https://doi.org/10.1093/sf/sov044.
[59] Robin L. Ersing, Richard Sutphen, and Diane Nicole Loeffler, "Exploring the Impact and Implications of Residential Mobility: From the Neighborhood to the School," *Advances in Social Work* 10, no. 1 (March 19, 2009): 1-18.

151.    For all of this, Ms. Somai has suffered stress and anguish over the threat of losing

her housing and the many collateral consequences of an eviction that will last for years

to come. She has lost sleep, felt bodily pains as a result of the stress, expended limited

funds on bus fare to find resources to assist with her eviction and challenge the

enforcement of the Nuisance Ordinance. Even if she is not evicted, she will remain in

fear of eviction based on the Ordinance.

## CLAIMS FOR RELIEF

### COUNT ONE
### VIOLATION OF THE OHIO CONSTITUTION AND THE FIRST AMENDMENT TO THE U.S. CONSTITUTION: FREE SPEECH & RIGHT TO PETITION

152.    Plaintiffs restate the preceding paragraphs of this Complaint as if fully rewritten

herein.

153.    The First Amendment to the United States Constitution protects the freedom of

speech and the right to petition the government for a redress of grievances.

154.    The Ohio Constitution also protects the rights of people to express themselves and

their needs. Ohio Const. Art. 1, § 11.

155.    It has been custom and/or policy of the City and its officials while acting under

color of state law to deprive Plaintiffs and other Bedford residents constitutional rights, specifically

their guaranteed right to freedom of speech and the right to petition the government for redress of

grievances.

156.    The Nuisance Ordinance and its application violates Plaintiffs' Constitutional right

to freedom of speech and to petition the government for redress of grievances.

157.    Communications to law enforcement—including (1) reporting physical assault, (2) reporting criminal activity, and (3) filing a complaint with law enforcement—are constitutionally-protected activities.

158.    The First Amendment also prohibits restrictions on the expression of information or speech, including prohibitions on reporting crime or requesting police service.

159.    Additionally, the Nuisance Ordinance is overly broad and infringes on the constitutionally protected right to freedom of speech and the right to petition the government for redress of grievances of Plaintiffs.

160.    The City's enforcement of the Nuisance Ordinance based on Ms. Somai's calls to the police for assistance directly violates her right to petition the government to redress grievances and the freedom of speech.

161.    Because of the Ordinance, Ms. Somai and Bedford residents like her fear penalties, including eviction, for calling the police, and are chilled from doing so.

162.    The Nuisance Ordinance, particularly as applied to victims of crime such as domestic violence, those in need of police assistance, and people seeking to report potential crimes, does not advance any compelling government interest and is not narrowly tailored to justify the infringement of the fundamental right to call the police.

163.    The deprivation of constitutional rights was a foreseeable consequence of the City's conduct.

164.    The City deprived and continues to deprive Plaintiffs of their constitutionally protected First Amendment rights.

165.    As a result of the wrongful actions of the City, Plaintiffs have and will continue to sustain impairment of their constitutional rights and attendant damage.

## COUNT TWO

## VIOLATIONS OF THE FOURTEENTH AMENDMENT TO THE U.S. CONSTITUTION: PROCEDURAL DUE PROCESS

166. Plaintiffs restate the preceding paragraphs of this Complaint as if fully rewritten herein.

167. The Fourteenth Amendment to the United States Constitution and its Ohio equivalent provide that no person shall be deprived of life, liberty, or property without due process of law. When government action puts an individual's liberty or property interests in jeopardy, the individual is constitutionally entitled to notice and an opportunity to be heard.

168. It has been custom and/or policy of the City and its officials while acting under color of state law to deprive Ms. Somai of her constitutional rights, specifically her guaranteed right to due process.

169. On its face and by design, the Nuisance Ordinance does not require any notice to tenants when the Ordinance is enforced related to properties where they reside, nor does it give tenants an opportunity to contest either the discretionary decision to characterize a situation as triggering the Ordinance or the decision to enforce the Ordinance. The Ordinance puts Ms. Somai and others throughout the City at risk of losing their housing and other injuries without any notice or opportunity to object.

170. The City deprived and continues to deprive Plaintiffs and others throughout the City of their constitutional right to procedural due process.

171. The deprivation of constitutional rights was a foreseeable consequence of the City's conduct. In fact, the City intentionally increased a tenant's exclusion from the process of designating the property a nuisance in 2017 when the Nuisance Ordinance clarified that tenants could not appeal a nuisance designation.

172.     As a result of the wrongful actions of the City, Plaintiffs and others like them have suffered and will continue to sustain impairment of their constitutional rights and damage.

**COUNT THREE**
**VIOLATIONS OF THE FOURTEENTH AMENDMENT TO THE U.S.**
**CONSTITUTION: EQUAL PROTECTION**

173.     Plaintiffs restate the preceding paragraphs of this Complaint as if fully rewritten herein.

174.     The Fourteenth Amendment prohibits states from denying an individual equal protection under the law.

175.     It has been custom and/or policy of the City and its officials while acting under color of state law to deprive Plaintiffs of their constitutional rights, specifically their guaranteed right to equal protection.

176.     The Nuisance Ordinance and its application violates Plaintiffs' Constitutional right to equal protection.

177.     The City intentionally discriminated in the enactment and enforcement of the Ordinance on the basis of race and sex.

178.     The City also lacked any rational basis for enacting the Ordinance, or for its enforcement practices.  Enforcement of the Nuisance Ordinance in situations where residents seek emergency or police assistance or are the victims of crime does not advance a legitimate government interest.

179.     By virtue of its actions as set forth herein, the City violated Plaintiffs' constitutional right to equal protection.

180.     The deprivation of constitutional rights was a foreseeable consequence of the City's conduct in enacting and enforcing the Ordinance.

38

181.     As a result of the wrongful actions of the City, Plaintiffs have suffered and will continue to sustain impairment of their constitutional rights and damage.

## COUNT FOUR: 42 U.S.C. §§ 3601 et seq.
## VIOLATION OF THE FEDERAL FAIR HOUSING ACT

182.     Plaintiffs restate the preceding paragraphs of this Complaint as if fully rewritten herein.

183.     The City's enactment and enforcement of its Nuisance Ordinance intentionally discriminates based on protected characteristics, including race, disability, and sex, in violation of the Fair Housing Act ("FHA").

184.     The City's enforcement of its Nuisance Ordinance has an unjustified disparate impact based on protected characteristics, including race, disability, and sex, in violation of the Fair Housing Act.

185.     The City's enforcement of its Nuisance Ordinance makes housing unavailable and discriminates in the terms, conditions, and/or privileges of housing, as well as in the provision of services in connection with the rental of housing, based on protected characteristics, including race, disability, and sex, in violation of the Fair Housing Act.

186.     The City failed to make reasonable accommodations in rules, policies, practices, and/or services, when such accommodations were necessary to afford members of protected classes the equal opportunity to use and enjoy a dwelling, in violation of the Fair Housing Act.

187.     As a result of the City's violation of the Fair Housing Act, Plaintiffs have suffered and will continue to suffer injury.

## COUNT FIVE: OHIO R.C. § 4112.02(H)
## VIOLATION OF OHIO'S FAIR HOUSING ACT

188.　Plaintiffs restate the preceding paragraphs of this Complaint as if fully rewritten herein.

189.　Plaintiffs are entitled to enforce their rights under Ohio's Fair Housing Act, R.C. § 4112.02(H).

190.　The City, as a political subdivision of the State of Ohio is a "person" required to comply with Ohio's Fair Housing Act R.C. § 4112.01(A)(1).

191.　The Ohio fair housing laws also bar practices that make housing unavailable or otherwise discriminate based on protected classes. These laws also bar discrimination in the terms or conditions as well as in the privileges in connection with occupancy.

192.　The Nuisance Ordinance violates Ohio law and has harmed Plaintiffs as set forth above.

193.　Accordingly, Plaintiffs suffered and will continue to suffer deprivation of their rights under Ohio law.

194.　The City's actions are illegal, violate R.C. §4112.02(H), and constitute discriminatory housing practices.

## COUNT SIX: 42 U.S.C. §§ 12131 ET SEQ.

## VIOLATION OF THE AMERICANS WITH DISABILITIES ACT OF 1990

195.　Plaintiffs restate the preceding paragraphs of this Complaint as if fully rewritten herein.

196.　The City is a public entity subject to Title II of the Americans With Disabilities Act of 1990, as amended, 42 U.S.C. §§ 12131 *et seq.*

197.     Through its enactment and enforcement of its Nuisance Ordinance, the City has discriminated against individuals with disabilities in violation of Title II of the Americans With Disabilities Act of 1990, as amended, 42 U.S.C. §§ 12132 *et seq.*, and its implementing regulations, 28 C.F.R. pt. 35.

198.     By the actions set forth above, the City has violated the ADA, 42 U.S.C. § 12131 *et seq.*, by, among other things:

a.   Denying qualified individuals with disabilities the benefit of its programs, services, or activities, 28 C.F.R. § 35.130(a);

b.   Denying qualified individuals with disabilities an equal opportunity to participate in or benefit from its programs, services, or activities, 28 C.F.R. § 35.130(b)(1)(ii);

c.   Utilizing criteria or methods of administration that have the effect of discrimination against qualified individuals with disabilities or that have the purpose or effect of defeating or substantially impairing accomplishment of the objectives of the City's program with respect to individuals with disabilities, 28 C.F.R. § 35.130(b)(3)(i), (ii), (8);

d.   Failing to make reasonable modifications in policies, practices, or procedures when the modifications are necessary to avoid discrimination on the basis of disability; 28 C.F.R. § 35.130(b)(7)(i); and

e.   Excluding or otherwise denying equal services, programs, or activities to an individual because of their relationship or association with a person with a disability, 28 C.F.R. § 35.130(g).

199.    The City's discriminatory conduct as described above has caused injury to individuals with disabilities and others associated with them, and to Plaintiff the Fair Housing Center, as detailed above.

200.    The City's conduct described above was intentional, willful, reckless, deliberately indifferent to, and/or otherwise taken with disregard for the rights of individuals with disabilities and those associated with them.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs seek:

(a)    A declaration that the Nuisance Ordinance is unconstitutional and/or unlawful as written and/or as applied and is, therefore, null and void;

(b)    Preliminary and/or permanent injunctive relief, including an order enjoining enforcement of the Nuisance Ordinance and an order directing the City of Bedford, its officers, employees, agents, successors and all other persons in active concert or participation with it, to take all affirmative steps to ensure its compliance with the Fair Housing Act and 4112.02(H) including steps to prevent the recurrence of any discriminatory conduct and to eliminate to the extent practicable the effects of its unlawful practices as described herein;

(c)    Compensatory damages;

(d)    Attorney's fees and costs pursuant to 42 U.S.C. § 1988(b), 42 U.S.C. § 3613(c), and Ohio R. C. §4112.51(D), and

(e)    Any further declarative, injunctive, financial or other equitable relief this Court deems equitable, just and appropriate.

January 30, 2019

42

Respectfully submitted,

*/s/Elizabeth Bonham*
Elizabeth Bonham (0093733)
Freda J. Levenson (0045916)
Joseph Mead (0091903)
American Civil Liberties Union of Ohio Foundation
4506 Chester Avenue
Cleveland, OH 44103
(614) 586-1958
ebonham@acluohio.org
attyjmead@gmail.com
flevenson@acluohio.org

Sandra S. Park (pro hac vice granted)
Linda Morris (pro hac vice granted)
American Civil Liberties Union
Women's Rights Project
125 Broad St. 18th Floor
New York, NY 10004
(212) 519-7871
spark@aclu.org
lindam@aclu.org

**Counsel for all Plaintiffs**

Sara E. Bird (0096545)
Jennifer E. Sheehe (0084249)
The Legal Aid Society of Cleveland
1223 West Sixth Street
Cleveland, Ohio 44113
Ph. (216) 861-5407 – SEB
Ph. (440) 210-4521 – JES
Fax (216) 861-0704
sara.bird@lasclev.org
jsheehe@lasclev.org

**Counsel for Plaintiff Beverley Somai**

43

## JURY DEMAND

Plaintiffs hereby demand a trial by the maximum number of jurors permitted by law as to all issues in this action.

/s/     *Elizabeth Bonham*
Sara E. Bird (0096545)
Jennifer E. Sheehe (0084249)
Elizabeth Bonham (0093733)
Joseph Mead (0091903)
Freda J. Levenson (0045916)
Sandra S. Park (pro hac vice granted)
Linda Morris (pro hac vice granted)